**Ex parte LaRoyce Lathair SMITH, Applicant.**

**NO. AP–74228.**

Court of Criminal Appeals of Texas.

March 1, 2006.

---

Jordan Steiker, Austin, for Appellant.

Kim Schaefer, Asst. District Atty., Dallas, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, and JOHNSON, JJ., joined.

This death-penalty habeas corpus case is on remand from the United States Su-

preme Court.[1] Our original opinion held that the *Penry*[2] jury nullification instruction given in applicant's case was not constitutional error because: (1) applicant's mitigation evidence was not "constitutionally relevant"; (2) his evidence was encompassed by the two statutory special issues, thus no special instruction was necessary; and (3) if a special instruction was necessary, the nullification instruction sufficed.[3] The Supreme Court reversed this Court's decision on the first and third issues; arguably, it did not approve of our resolution of the second issue. We now hold that, assuming that the statutory special issues were not wholly sufficient to allow the jury to give "*full* consideration and *full* effect to mitigating circumstances,"[4] applicant has failed to show "egregious harm" under *Almanza*[5] for this unobjected-to jury-charge error. We therefore deny relief.

## I.

In 1991, a jury convicted applicant of capital murder for the robbery-murder of Jennifer Soto. Because an analysis of all of the evidence offered at trial is an essential component of any *Almanza* "egregious harm" analysis, we set out that evidence in detail.

First, we review the evidence from the guilt stage. The State's evidence showed that Jennifer Soto was a 19–year–old girl who worked at Taco Bell. She was a hard worker and had been promoted to shift manager two weeks before her death. Ap-

plicant had worked at Taco Bell with her. On the evening of January 7, 1991, she was "closing manager" and Travis Brown was working with her. He was waiting for her to finish her office paperwork because she was going to give him a ride home.

Meanwhile, Nickles Lewis and two other friends came to applicant's house. Applicant told them that he was going to rob Taco Bell because he needed "some money for court." The four youths left applicant's house on foot, but they were soon picked up by Kevin Shaw and one of Shaw's friends who were riding around in Shaw's car. They stopped at another house so applicant could get a gun, and applicant said, "We're going to hit T.B." Applicant knew Jennifer would be working that night. He told one of his cohorts, "If she see[s] my face, I will have to kill her."

Kevin Shaw parked the car containing the six youths across the street from the Taco Bell. Applicant, Kevin Shaw, and a third member of the group, Devario Smith, got out of the car and paced outside the Taco Bell, waiting for Jennifer to come out of the back door. They waited 45 minutes, but she did not come out. When "things didn't go right," they all got back into the car and started to leave, but applicant said, "No, man, it got to be done. It got to be done." They turned around and went back.

At about 11:30 p.m., applicant knocked on the front door and asked to use the

---

1. *Smith v. Texas,* 543 U.S. 37, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (*per curiam* ).

2. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

3. *Ex parte Smith,* 132 S.W.3d 407, 409, 412–16 (Tex.Crim.App.2004).

4. *Penry v. Johnson,* 532 U.S. 782, 797, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II* ) (quoting *Johnson v. Texas,* 509 U.S. 350, 381,

113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (O'Connor, J., dissenting)).

5. *Almanza v. State,* 686 S.W.2d 157 (Tex. Crim.App.1984) (op. on reh'g). *See Penry v. State,* 178 S.W.3d 782, 788 (Tex.Crim.App. 2005) (applying *Almanza* harmless error analysis to constitutionally erroneous jury instruction concerning use of mental impairment evidence that did not rise to level of mental retardation).

phone because his car had broken down. Travis, without opening the door, said that the Taco Bell was closed and that applicant could not come in. Applicant then asked to see Jennifer and when she came to the door, he repeated his request. Jennifer opened the door partway and applicant hugged her as he, Kevin, and Devario went inside. She showed applicant the telephone and went back to the office to finish up her paperwork while applicant's two companions stayed in the front with Travis.

After he pretended to finish his telephone call, applicant came back to the front and told Travis that "they were going to rob the place." Kevin told Travis, "If you keep your mouth shut, you'll get a cut of the money." Applicant went back, by himself, into the office where Jennifer was working.

Shortly thereafter, Travis heard yelling. When he went to investigate, he saw applicant holding Jennifer in a headlock. He was "pistol-whipping" her on the head with the butt of a gun. He kept hitting her until the gun's handle fell off. Applicant demanded the combination of the safe, but Jennifer screamed, "Call Tina, call Tina." She did not know the combination. Travis saw applicant step back, point the gun at Jennifer's back and shoot her at point blank range. She cried, "God, please don't let me die."

Applicant then went into the kitchen area, grabbed a butcher knife, and came back to Jennifer, continuing to demand the combination. He stabbed her underneath the left breast to make her tell him the combination, but when she did not give him the information he wanted, he stabbed her in the thigh, then the abdomen, then the head. The State characterized these as "torture type wounds." Finally, he sliced her neck, severing the jugular vein.

Both the gunshot and the neck wound were fatal.

Applicant, still carrying the bloody knife, walked out to the front. Travis jumped out of the way, saying "Hey, I don't know your face. I've never seen you. I don't know anything." Applicant replied, "Hey, I know your face and I'll kill you." After applicant and his two cohorts left, Travis called 911.

Applicant testified on his own behalf and stated that he was nineteen years old at the time of the robbery-murder and that he was, by the time of trial, the father of a baby boy. He stated that when Kevin Shaw drove by on January 9, 1991, he stopped and asked applicant and his friends if applicant's "homeboy" would let Kevin use his gun. Applicant went to his friend's apartment and asked him if Kevin could buy his gun. The friend agreed and gave applicant his gun, which was in a bag. Nobody said anything about going to the Taco Bell until the car arrived there.

Then, according to applicant, Kevin suddenly announced, "I'm fixing to rob Taco Bell." Kevin explained to applicant, "Travis is going to open the back door so I can rob it." Applicant and two others waited around for a while, but Travis did not come outside, so they all left, but Kevin insisted that they return. According to applicant, Kevin knocked on the door, Travis opened it, and Kevin, Devario, and applicant entered. Jennifer never came to the front of the store. Applicant stayed in the front with Travis until he heard a shot, and then he went back to the office and saw Kevin hitting Jennifer with the gun until it broke. Kevin told Jennifer to open the safe, but she didn't know the combination. Then Kevin picked up a butcher knife and started stabbing Jennifer. Applicant grabbed the bloody knife away from Kevin and started out of the store with it. Travis said, "Damn, man, that

wasn't even in it." Applicant testified that Travis's statement meant that killing Jennifer was not part of the "plan" to rob the Taco Bell that Travis was involved in.

Applicant said that he knew Jennifer, liked her, and thought that "no one should die the way she died." According to applicant, all of the State's witnesses, including his friends who were with him that night, lied about the robbery-murder at Taco Bell. He was a "Good Samaritan" who tried to save Jennifer by grabbing Kevin's knife.

The jury rejected applicant's version of the events and convicted him of capital murder.

During the punishment phase, the State offered evidence that, two days after murdering Jennifer, applicant had physically assaulted Chris Standmier, the former boyfriend of applicant's then-current girlfriend. Chris testified that he was home for the Christmas holidays from Prairie View University. He was standing in his mother's apartment parking lot when two cars pulled up. Applicant got out of one of them, took out a baseball bat and proceeded to beat Chris with it. Applicant hit Chris so hard that the bat broke in two. As Chris lay on the ground, applicant went back to the car, pulled out a Tech 9 pistol from the car, cocked it and told Chris, "N——, get back from me. I'm going to kill you. I'll kill you." Chris said, "You got me." Then applicant got back into the car and they drove off. Chris went to the hospital.

The State also offered evidence that two months before the capital murder, officers arrested applicant on outstanding warrants as he was walking down the middle of the street in a high-crime area. While booking him into the jail, officers found ten ziplock baggies of crack cocaine in his underwear.

Several of applicant's teachers testified about applicant's conduct in school. One teacher, who taught applicant economics and math, testified that applicant was "taunting" in class and used abrasive, obscene language. He was sometimes mean and sometimes "docile." This high school teacher said that applicant seemed "threatening"—as if he would hurt the teacher— when he insisted that the teacher give him a passing grade in economics. The teacher was scared, in part because he was positive that applicant had earlier stolen his car's tires and rims.

Applicant's middle school vice-principal testified that he had suspended applicant from school for disruptive behavior in the classroom, possible weapons violations, throwing objects at teachers, and profanity. He had a bad reputation for peaceful and law-abiding activity and for respect toward authority.

A Dallas police officer, a member of the Youth Division at applicant's high school, testified that he found a Tech 9 in a locker shared by applicant and Nickles Lewis. Nickles told the officer that the gun was his, but applicant had five bullets in a bag he was carrying at the time. The officer thought applicant had a gun also, but he was unable to find it.

The defense called nineteen witnesses during its punishment case. Fifteen of those were character witnesses. Applicant's middle school assistant principal testified that he had "8,000 problems at school, but applicant wasn't one of them," because he did not recall applicant. A pastor said that applicant's family attends church, and applicant always came with his mother. "[H]e's always been an impressive young man." He showed respect to the people at church and to his mother. When the pastor visited applicant in jail he showed remorse for Jennifer's death: he began to cry and said, "I saw her body."

He thought applicant was capable of rehabilitation. The pastor said that he was aware that applicant's father stole from the family to support his crack habit. He said that such things have an adverse effect upon children: "Family troubles definitely affect the children." Although the pastor had never been to applicant's home and had never counseled applicant personally, he did not think that applicant would be a future danger to society.

The custodian of records for the special education department of the Dallas ISD testified that applicant's records showed that he could not read or do numbers in kindergarten. According to his kindergarten teacher, applicant "is a little rough, but enjoys his friends; he must be kept separate from a few because he's easily led into trouble." At the age of ten, applicant was diagnosed as learning disabled with a speech handicap. He was put into a special education reading group [6] and given speech therapy. According to these school records, when he was eleven in 1982, applicant was

> implicated in numerous thefts at school, particularly of the speech clinician's purse. School contact with the parent indicated that LaRoyce has also been believed to be stealing at home.... Family stresses are reported. LaRoyce's behavior in class is exemplary and it has shocked school personnel that LaRoyce has been involved in stealing. He has admitted to theft and has cried when questioned about misbehavior.

At the age of thirteen, his WISC–R I.Q. testing showed a verbal I.Q. of 75, performance I.Q. of 84, and a full scale I.Q. of 78. At the end of 1986, applicant was phased out of the special education reading program because he then performed at grade level.

A high school classmate and football player testified that applicant once came to his rescue when a group from another high school "jumped him" and stabbed him. He thanked applicant, who said, "That's what friends are for."

Applicant's fiancee, the mother of his child, testified that applicant is not violent. Applicant would advise her sisters about doing their homework and not to make mistakes like he did. "Don't do what I did, you know, and slack off." According to her, applicant "just got with the wrong people, that's all." According to the fiancee's mother, applicant acted like a surrogate father to his younger sister. "[H]e appeared to try to guide her and keep her aware of society, people, boys, and things, and help her select appropriate young men friends." He is "a person who has been taught right from wrong and who respects society and respects people." He has an "average" intelligence and "is a person who has an intelligence capable of understanding and learning."

Applicant's best friend testified that he had not seen applicant be abusive to women. Applicant's brother, Myron, worked for UPS. He testified that when applicant's father went off on his motorcycle and used crack, Myron acted as a father figure to applicant. Applicant's mother brought her VCR, TV, microwave, and Tupperware over to Myron's house so applicant's father couldn't steal them and sell them for drugs. The family problems "affected" applicant, but Myron did not elaborate on the effect of these problems. A friend of applicant's mother testified that the father's drug habits affected the family because his mother had to act as both parents and she

---

**6.** In the 1991 trial, the records custodian testified that each year over 13,000 children in the Dallas Independent School District were involved with special education classes, and the district employed 800 personnel in that one department.

had "to pay the bill if we go out to eat like we used to." A legal assistant and student at UT–Arlington thought applicant was "a big loveable teddy bear" who had a lot to contribute to society because "he is willing to help people." A 69–year–old former neighbor testified that applicant "has been a good neighbor" and played with his grandchildren. A woman who had dated applicant's older brother testified that when she had a young baby and no income, applicant invited them to stay at his house. He let her use his bedroom with its queen-sized waterbed while he slept on the living room sofa. Applicant told her that because of his father's drug habit, he had to be the man of the house, so he went out and got a job at age fifteen or sixteen. The mother of one of applicant's former girlfriend's testified that she never had a problem with applicant; he was a fun person, always kidding around. He brought her a corn plant and a couple of ivy plants; he bought her some mirrors. Another friend testified that applicant is a nice young man: "He's the type I wouldn't mind having for a son." He was never disrespectful or violent.

Applicant's mother testified that she thinks applicant still has worth and value as a human being. Applicant "is a good child. He was a slow learner, but he's worthwhile. There's no way [applicant] would have hurt Jennifer. He was too crazy about Jennifer. She was a good and decent child. I'm so sorry for [her] family." Applicant's mother knew that applicant "would never hurt nobody."

In rebuttal, the State called a different middle-school assistant principal who testified that he had received numerous disciplinary referrals about applicant. One of them read, "LaRoyce talks out in class daily. He laughs out loud, plays around, and disrupts class daily. I cannot tolerate him." Applicant told a different teacher, "I'm going to kick your ass." Another of applicant's high school teacher's testified that he had applicant in his pre-Algebra and physical-science class. "In one class, he called me a m—— f—— 7 times in one 55 minute period. On two occasions he tried to kill me. On one occasion he was going to put a bullet in my m—— f——ing head." Applicant was taken out of this teacher's class after about six weeks: "He would come in with no books, no preparation, never do any work, and sit sideways in the seat and just act like a little portent of evil.... He was always a big-time problem. It was a constant conflict."

At the punishment-charge conference, applicant requested an instruction on the objectives of the Penal Code as set out in Section 1.02; the trial court granted that request. Applicant also objected to the "anti-parties" instruction and asked for an instruction requiring the jury to find, "point-blank," that it was applicant who "directly" killed Jennifer by his own conduct. The trial court refused that instruction. The trial judge also gave the jury a non-statutory nullification instruction pursuant to the Supreme Court's then-recent decision in *Penry v. Lynaugh*.[7] Applicant did not object to the jury nullification instruction.[8]

---

**7.** 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (*Penry I*).

**8.** Applicant filed a pretrial "Motion to Declare Tex.Code Crim. Proc. Ann. Art. 37.071 Unconstitutional," claiming that the entire Texas statutory death-penalty scheme was invalid after *Penry I*, because "it does not provide for the introduction and subsequent use by the

jury of mitigating evidence which is not relevant or material to the special issues." Therefore, according to applicant, the trial court was precluded from providing *any* instructions regarding mitigating evidence. "For the trial court to create a scheme that would permit the jury to respond to the De-

Based upon the evidence admitted at trial and the trial judge's instructions, the jury answered the two special issues "yes," and the trial judge sentenced applicant to death.

On direct appeal, applicant claimed that, under *Penry I*, Article 37.071 was unconstitutional because the jury was unable to give effect to his mitigating evidence in answering the special issues.[9] We rejected this claim and held that, even if applicant's mitigation evidence were beyond the scope of the two statutory special issues, the trial judge's supplemental instruction provided a sufficient vehicle for the jury to fully consider all of that evidence.[10] The Supreme Court declined to review applicant's claims on direct appeal.[11] We dismissed applicant's first petition for writ of habeas corpus because it was untimely filed, and he did not show any excuse or exception for its late filing.[12] The Supreme Court again denied certiorari.[13] We then allowed applicant to file a second petition for writ of habeas corpus which included, *inter alia*, a claim that the trial judge's supplemental "nullification" instructions were unconstitutional under the *Penry II* standard announced by the Supreme Court in 2001. We denied relief,[14] but the Supreme Court reversed our decision based upon its own opinion in *Tennard v. Dretke*,[15] which was delivered several months after our decision.

In our former opinion, we noted that applicant relied on evidence of

(1) his limited mental capacity, specifically that he was a "slow learner" in school, that he had an I.Q. of 78 and possible organic learning disabilities, and that he had dropped out of school in the ninth grade at the age of eighteen;

(2) his youthful age of nineteen at the time he committed this capital murder; and

(3) his father's time in prison, involvement with a motorcycle gang, drug and alcohol use, and stealing from his own family;

to support his claim that he produced *Penry*-type evidence beyond the scope of the two statutory special issues.[16] We held that applicant had failed to show that

> any mitigating quality of his family background and mental-limitations evidence could not be fully encompassed by

fendant's mitigating evidence would contradict the current status of the law."

The trial court denied this motion at a pretrial conference, but gave applicant's counsel a draft copy of the punishment charge and stated,

> If you see something in that charge that you'd like worded differently or you think could be made clearer or better, I'm always willing to entertain different wording or different ways of putting the idea. So if you come up with something better, just let me know and I'll look at it.

Applicant did not have any objection to the specific wording of the punishment charge; his objection went to the continued validity of the Texas statute after *Penry I*.

9. This claim was based upon his pretrial motion to declare article 37.071 unconstitutional as applied.

10. *Smith v. State*, No. 71,333 slip op. at 10–11 (Tex.Crim.App. June 22, 1994) (not designated for publication).

11. *Smith v. Texas*, 514 U.S. 1112, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995).

12. *Ex parte Smith*, 977 S.W.2d 610 (Tex.Crim. App.1998).

13. *Smith v. Texas*, 525 U.S. 1148, 119 S.Ct. 1047, 143 L.Ed.2d 53 (1999).

14. *Ex parte Smith*, 132 S.W.3d 407 (Tex.Crim. App.2004).

15. 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

16. *Smith*, 132 S.W.3d at 413.

the two statutory special issues. Applicant's mental limitations were surely relevant to whether he acted deliberately in committing this robbery-murder and both his learning disability and troubled background were relevant to whether he would constitute a future danger to society. In *Penry*, the evidence supported an inference that the defendant was unable to learn from his mistakes as a result of his low I.Q., brain impairments, and severe childhood abuse. Thus, he was more likely to be a future danger because of his permanent disabilities. Here, the evidence shows the reverse: despite applicant's limitations and difficulties, his behavior in school was often "exemplary." There is no evidence that applicant was unable to learn from experience or unable to control his conduct, with or without his disabilities.[17]

The Supreme Court did not address our conclusion "that the two special issues provided applicant's jury with a constitutionally sufficient vehicle to give effect to his mitigating evidence."[18]

## II.

■■■■ The usual method by which we assess purported jury instruction or charge errors is set out in *Almanza v. State*.[19] The *Almanza* standard applies both on direct appeal[20] and on the review of habeas corpus applications.[21] *Almanza*

17. *Id.* at 414–15. We footnoted *Graham v. Collins*, 506 U.S. 461, 475–76, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), in which the Supreme Court stated, "We do not read *Penry* as effecting a sea change in this Court's view of the constitutionality of the former Texas death penalty statute; it does *not* broadly suggest the invalidity of the special issues framework." *Id.* at 474, 113 S.Ct. 892 (emphasis in original). The Supreme Court explained that in Gary Graham's case,

> the rule that Graham seeks is not commanded by the cases upon which *Penry* rested. In those cases, the constitutional defect lay in the fact that relevant mitigating evidence was placed beyond the effective reach of the sentencer. In *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)], *Eddings* [*v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)], *Skipper* [*v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)], and *Hitchcock* [*v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987)], the sentencer was precluded from even considering certain types of mitigating evidence. In *Penry*, the defendant's evidence was placed before the sentencer but the sentencer had no reliable means of giving mitigating effect to that evidence. In this case, however, Graham's mitigating evidence was not placed beyond the jury's effective reach. Graham indisputably was permitted to place all of his evidence before the jury and both of Graham's two defense lawyers vigorously urged the jury to answer "no" to

> the special issues based on this evidence. Most important, the jury plainly could have done so consistent with its instructions. The jury was not forbidden to accept the suggestion of Graham's lawyers that his brief spasm of criminal activity in May 1981 was properly viewed, in light of his youth, his background, and his character, as an aberration that was not likely to be repeated. Even if Graham's evidence, like *Penry's*, had significance beyond the scope of the first special issue, it is apparent that Graham's evidence—*unlike* Penry's—had mitigating relevance to the second special issue concerning his likely future dangerousness. Whereas Penry's evidence compelled an affirmative answer to that inquiry, despite its mitigating significance, Graham's evidence quite readily could have supported a negative answer.

> *Id.* at 475–76, 113 S.Ct. 892.

18. *Smith*, 132 S.W.3d at 415–16.

19. 686 S.W.2d 157 (Tex.Crim.App.1984) (op. on reh'g).

20. *See, e.g., Pickens v. State*, 165 S.W.3d 675, 680 (Tex.Crim.App.2005) (unobjected-to jury charge error is analyzed for "egregious harm" under *Almanza* ).

21. *See Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex.Crim.App.1985) (unobjected-to jury-charge error is analyzed under *Almanza's*

applies to federal constitutional errors contained within the jury charge.[22] Under that familiar standard, we must decide:

1. Was there error in the jury charge?
2. If so, "the next step is to make an evidentiary review . . . as well as a review of any other part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." If the defendant failed to object to the jury charge, he must show that the error caused him such egregious harm that he did not have "a fair and impartial trial." [23]

We will apply our usual *Almanza* analysis to applicant's claim that the jury charge did not ensure that the jury could give full effect to his mitigation evidence.

Therefore, we first re-examine whether applicant's mitigation evidence was fully encompassed within the two statutory special issues.[24] In our 2004 opinion, we held that the jury could fully address this evidence within the confines of the two special issues, but we used an analytical framework that was later repudiated by the Supreme Court in *Tennard*.[25] We are uncertain whether the Supreme Court also concluded that some of applicant's mitiga-

tion evidence was outside the reach of the two special issues, and, if so, exactly what evidence was beyond the ambit of those special issues.

Traditionally, this Court has looked to the factors set out in *Keeton v. State*[26] (decided two years before *Penry I*) to determine whether the State has proven, beyond a reasonable doubt, that the defendant would probably commit criminal acts of violence that would constitute a continuing threat to society. Those factors include, but are not limited to:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

(2) the calculated nature of the defendant's acts;

(3) the forethought and deliberateness exhibited by the crime's execution;

(4) the existence of a prior criminal record, and the severity of the prior crimes;

(5) the defendant's age and personal circumstances at the time of the offense;

---

"egregious harm" standard on habeas). Cf. *Ex parte Dutchover*, 779 S.W.2d 76, 77–78 (Tex.Crim.App.1989); *Ex parte Crispen*, 777 S.W.2d 103, 104–05 (Tex.Crim.App.1989), *id.* at 106–10 (Clinton, J., concurring) (arguing that court should limit cognizability of habeas claims to "exceptional" constitutional defects so " 'fundamental' as not to be susceptible to a determination of harm").

Indeed, it would be quite illogical to employ a lesser standard of review for constitutional error on habeas review than on direct appeal. Were we to follow *Almanza* for jury-charge error on direct appeal, but adopt a lesser standard of review on habeas, the natural and logical result would be that all jury charge claims would be deferred until a person filed a petition for the writ of habeas corpus.

**22.** *Jimenez v. State*, 32 S.W.3d 233, 238 (Tex. Crim.App.2000).

**23.** *Almanza*, 686 S.W.2d at 174 (such a fundamental error must "go to the very basis of the case," or "vitally affect his defensive theory").

**24.** On direct appeal, we did not explicitly address this question. *Smith*, No. 71,333 slip op. at 10–11.

**25.** *See Tennard*, 542 U.S. at 284–88, 124 S.Ct. 2562 (rejecting Fifth Circuit's threshold standard for constitutionally relevant mitigating evidence); *Smith v. Texas*, 543 U.S. at 44, 125 S.Ct. 400 (rejecting this Court's reliance upon Fifth Circuit's standard).

**26.** 724 S.W.2d 58 (Tex.Crim.App.1987).

(6) whether the defendant was acting under duress or the domination of another at the time of the offense;

(7) psychiatric evidence; and

(8) character evidence.[27]

We relied upon these specific factors in rejecting applicant's claim, on direct appeal, that the evidence was insufficient to prove, beyond a reasonable doubt, that applicant would probably commit criminal acts of violence that would constitute a continuing threat to society.[28] Indeed, in his brief on direct appeal, applicant relied upon the very evidence that he now contends the jury could not adequately address under the two special issues to support his argument that the evidence was legally insufficient to show his future dangerousness. There he argued: "Appellant was nineteen years old at the time of the offense. He produced evidence that he was close to being mentally retarded and at the very least had a history of learning disabilities. His evidence showed a history of family strain caused by his father, who sold the family's personal property to buy cocaine."[29] According to applicant, this evidence, coupled with "[a]ppellant's exten-sive character evidence, which essentially went unrebutted by the State, established that appellant did not have a violent character and that the offense was an aberration."[30]

It would logically follow that, if applicant's mitigating evidence fit within the *Keeton* factors and was relevant in assessing the legal sufficiency of the evidence to support a jury's verdict of "future dangerousness," that evidence would be encompassed under the "future dangerousness" special issue. Evidence of applicant's youth would clearly be encompassed under the fifth *Keeton* factor, and Texas courts have agreed with the Supreme Court that the mitigating value of a defendant's youth can be considered under the "future dangerousness" special issue.[31] Similarly, evidence of applicant's generally "exemplary" behavior in his special-education classes could be considered under both the fourth and eighth *Keeton* factors as showing a relative lack of criminal behavior and generally good character. Evidence of his father's drug habit and theft from his family which may have "affected" applicant's character in some way[32] could be considered under the eighth factor.[33] Arguably,

27. *Keeton,* 724 S.W.2d at 61.

28. *Smith v. State,* No. 71,333 slip op. at 2–5 (Tex.Crim.App. June 22, 1994) (not designated for publication).

29. Brief on Direct Appeal at 27.

30. *Id.* at 29.

31. *See Johnson v. Texas,* 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (mitigating value of capital defendant's youthfulness was encompassed by Texas's second special issue; "It strains credulity to suppose that the jury would have viewed the evidence of petitioner's youth as outside its effective reach in answering the second special issue."); *Graham,* 506 U.S. at 475–76, 113 S.Ct. 892; *Barley v. State,* 906 S.W.2d 27, 39 (Tex.Crim.App.1995) ("Evidence of a defendant's age at the time of the offense is also a

relevant consideration to whether a defendant constitutes a future danger to society. The United States Supreme Court has repeatedly approved of the consideration of a defendant's youth at the time of the offense because the impetuous qualities associated with youth are typically mollified by age and maturity.") (citations omitted).

32. It is possible that applicant's conduct of stealing from his mother and his teachers might be connected to his knowledge of his father's thievery, but no witness ever made such a connection.

33. *See Graham,* 506 U.S. at 476, 113 S.Ct. 892 (indicating that family background evidence falls within the scope of Texas's special issues; "Graham's evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of

evidence of applicant's somewhat limited mental capacity (a school record notation of a full scale I.Q. of 78, and another cursory note on the same school form of "possible organic cause for learning problems") could not be fully considered under the *Keeton* factors, although Texas cases have held that evidence of limited mental ability may be considered under both statutory special issues.[34]

We also note that numerous post-*Smith*, post-*Tennard* Fifth Circuit cases have held that mitigating evidence of this type is fully encompassed by the Texas "future dangerousness" or "deliberation" special issues.[35] Nonetheless, because we are un-

---

age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse"); *Zimmerman v. State*, 881 S.W.2d 360, 362–63 (Tex. Crim.App.1994) (defendant's mitigating evidence that he came from a " 'very disruptive, uneven family environment,' he experienced parental abandonment on two occasions, and that … he had suffered some abuse as a child" could be considered under two special issues). In our original habeas corpus opinion, we stated that applicant's

> father had been in prison for robbery, was involved with a motorcycle gang, consorted with other women, used alcohol and drugs, and stole from his own family. This situation upset applicant. Because the family did not have a lot of money, applicant began looking for work as a young teen-ager. According to defense witnesses, applicant suffered because of his father's thefts from the family and from a lack of money in the home.

132 S.W.3d at 413. However, no witness at trial described how the conduct of applicant's father did, or might have, "affected" applicant, except to say that he got a part-time job at the age of 15 or 16.

**34.** *See, e.g., Zimmerman*, 881 S.W.2d at 362 (defendant's mitigating evidence, including testimony that his I.Q. was "in the 80's," could be considered under the statutory special issues); *Gunter v. State*, 858 S.W.2d 430, 445–46 (Tex.Crim.App.1993) (mitigation evidence that defendant was abandoned by mother, abused as a child, and subject to strict discipline by adopted parents who sent him to school unbathed and unfed as punishment could be considered under special issues), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290 (Tex.Crim.App.1994); *Goss v. State*, 826 S.W.2d 162, 166–67 (Tex. Crim.App.1992) (evidence of troubled childhood is adequately considered within second special issue); *Williams v. State*, 773 S.W.2d 525, 537–38 (Tex.Crim.App.1988) (evidence of

defendant's low I.Q., though relevant to special issues, did not preclude jury from finding that he acted deliberately or from making an affirmative finding of future dangerousness); *Goodman v. State*, 701 S.W.2d 850, 866–67 (Tex.Crim.App.1985) (defendant's evidence of mild mental retardation did not make evidence insufficient to support jury's findings of deliberateness and future dangerousness), *overruled on other grounds by Hernandez v. State*, 757 S.W.2d 744 (Tex.Crim.App.1988).

**35.** In most of its post-*Tennard* decisions, the Fifth Circuit has concluded that the defendant's mitigating evidence could be fully addressed by the jury under the two Texas special issues. *See, e.g.,*

● *Summers v. Dretke*, 431 F.3d 861, 882 (5th Cir.2005) (defendant's evidence of good character and good conduct could be given effect under Texas's statutory special issues);

● *Draughon v. Dretke*, 427 F.3d 286, 297–98 (5th Cir.2005) (defendant's evidence of abuse as a child and "dysfunctional upbringing" could be given effect under future dangerousness issue);

● *(Roy Gene) Smith v. Dretke*, 422 F.3d 269, 287 (5th Cir.2005) (defendant's evidence of addiction/intoxication and childhood poverty were seemingly both covered by the special issues; arguably, evidence of his exposure to a crime-infested environment might not have been; COA on *Penry* claim granted);

● *Cole v. Dretke*, 418 F.3d 494, 500–11 (5th Cir.2005) (statutory special issues were broad enough to encompass defendant's evidence of his "destructive family background," fragmented personality, organic neurological deficiency, and youth);

● *Coble v. Dretke*, 417 F.3d 508, 522–27 (5th Cir.2005) (defendant's evidence of troubled childhood, mother's nervous breakdown, his orphanage, post-Vietnam mental instability, mental illness that could be con-

certain as to the Supreme Court's current *Penry II* jurisprudence,[36] we will assume, for the sake of argument, that at least some of applicant's evidence was not fully encompassed by the two special issues. Thus, we shall assume that the jury charge in this case was constitutionally deficient under *Penry II.*

### III.

■ A constitutionally deficient jury charge, however, does not result in automatic reversal of a conviction under *Almanza.* We must also assess the harm that this deficient jury charge caused the

trolled by medication, as well as evidence that he was well-respected and liked were all covered by statutory special issues; noting that "the supplemental instruction given in addition to the special issue interrogatories is *only* unconstitutional where the special issues themselves are not broad enough to provide a vehicle for the jury to give effect to the defendant's mitigation evidence"; any error in giving the supplemental instructions would be harmless and therefore not the basis for habeas relief);
● *Brewer v. Dretke,* 410 F.3d 773, 777–78 (5th Cir.2005) (special issues covered defendant's evidence that he had a bout with mental illness three months before murder, co-defendant manipulated him, he was abused by his father, saw his father abuse his mother, and he abused drugs).
In *Bigby v. Dretke,* 402 F.3d 551, 564–72 (5th Cir.2005), however, the Fifth Circuit found that the defendant's evidence that he suffered from untreatable chronic paranoid schizophrenia was *not* encompassed by the statutory special issues; thus, it granted habeas relief to Bigby.

36. The Fifth Circuit seems to share our uncertainty. *See, e.g., (Roy Gene) Smith v. Dretke,* 422 F.3d 269, 287 n. 8 (5th Cir.2005) ("We note that the Supreme Court has never explicitly stated that *Penry* claims cannot be extended beyond claims involving evidence of 'mental impairment.' In fact at times, it seems the Court has said the exact opposite.... The only mention the *Smith* Court made of whether the defendant's evidence was outside the reach of the special issue questions was the Court's single sentence that 'just as in *Penry*

defendant. Whether sufficient harm resulted from the charging error to require reversal depends upon whether the defendant specifically objected to the error at trial. Under *Almanza,* when there has been a timely objection made at trial, we look only for "some harm." By contrast, where the error is urged for the first time on appeal or an application for habeas corpus relief, we look for "egregious harm." [37] We most recently applied our familiar *Almanza* standard of review to constitutional error in the jury charge in reversing the third death-penalty sentence of Johnny Paul Penry.[38]

*II,* petitioner's jury was required by law to answer a verdict form that made no mention whatsoever of mitigation evidence. And just as in *Penry II,* the burden of proof on the State was tied by law to findings of deliberateness and future dangerousness that had little, if anything, to do with the mitigation evidence petitioner presented.' ").

37. *Almanza, supra,* 686 S.W.2d at 171; *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App. 1986).

38. *See Penry v. State,* 178 S.W.3d 782, 788 (Tex.Crim.App.2005) (stating that, after finding constitutional error in the jury charge, "[u]nder Code of Criminal Procedure Article 36.19, we will not reverse a conviction or sentence on the basis of jury charge error 'unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears that the defendant has not had a fair and impartial trial.' "; finding "some harm" under *Almanza* to objected-to jury charge error); *see also Ngo v. State,* 175 S.W.3d 738, 750–52 (Tex.Crim.App. 2005) (finding "egregious harm" under *Almanza* to unobjected-to constitutional error in jury charge). As this Court stated in *Jimenez v. State,* 32 S.W.3d 233 (Tex.Crim.App.2000):

The question in this case is, what standard of harmless error applies to error in a court's charge that was not objected to, and that is claimed to violate a constitutional provision? We hold that the applicable standard is that provided by article 36.19 of the Code of Criminal Procedure: "the judg-

In analyzing jury-charge error under *Almanza* we review the entire trial record, from voir dire through closing arguments at the punishment stage, to determine whether applicant suffered "egregious harm" from the deficient jury charge.

During voir dire, both the State and applicant questioned almost all potential jurors regarding their ability to consider mitigating evidence. Both sides explained the process of allowing jurors to change one of the special issue answer from a "yes" to a "no" if they found mitigating evidence sufficient to warrant a life sentence rather than the death penalty. Overwhelmingly, the jurors agreed that they could change a "yes" answer to "no" if instructed by the judge to do so upon finding sufficient mitigating evidence.[39] The Supreme Court specifically noted that the nullification instruction "intensified the dilemma faced by ethical jurors"[40] in this case. That is indeed a possibility, although neither the jurors who served, nor the parties or trial judge noted such a potential dilemma or expressed such a concern, either during voir dire or later. *Almanza* requires a showing of "actual, not just theoretical, harm to the accused."[41] Given the record in this case, we cannot say that the discussion of the special issues and the nullification instruction during voir dire shows "actual" harm, much less "egregious" harm.

---

ment shall not be reversed ... unless it appears from the record that the defendant has not had a fair and impartial trial." *Id.* at 233. "A party is not excused from the procedural requirements for objecting at trial merely because an error involves a constitutional right." *Id.* at 235. We explained that to invoke the protection of this federal rule [of casting a burden on the State to prove, beyond a reasonable doubt, that constitutional error was harmless under *Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] in a state court, the appellant must have complied with the state court's procedural rule for preserving and presenting error. " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " If the right is forfeitable, as most rights are, an appellant who did not comply with the rules for preserving and presenting error must rely on the forum's rules for consideration of unpreserved error.
*Id.* at 238 (footnote and citations omitted).

39. The only exception was one juror (Mr. Zimmerman) who stated that he did not think that evidence of a defendant's drug abuse or childhood poverty would mitigate a death sentence. However, he indicated that he could consider other mitigating evidence such as mental capacity. The court then questioned him further:

> And after you have heard everything, if you thought well, [the answer to special question] one ought to be yes and [the answer to special question] two ought to be yes, but I think based on this man's something, something in his past, something about him, I don't think he ought to die, then you would be willing to go back and change one of the answers to no to make sure he didn't die; is that right?

The juror said that he would be able to do so. Defense counsel argued that the juror could not consider mitigating evidence, and that his agreement with the questions posed by the court and the State were "simply paying lip service to the idea of actually really giving fair consideration to any mitigating circumstances in the case." When the trial court ruled that the juror was qualified, applicant used his final peremptory challenge on him. The court's ruling was within the bounds of reasonableness; furthermore, the juror was not empaneled, and therefore applicant was not harmed by any potential prejudice caused by the juror's inability to consider a poor childhood or drug addiction as mitigating evidence.

40. *Smith v. Texas,* 543 U.S. at 48, 125 S.Ct. 400.

41. 686 S.W.2d at 174.

Turning to the evidence at the guilt stage, the State and the defense painted markedly different portraits of the Taco Bell robbery-murder and applicant's participation in that grisly deed. If the jury believed the State's evidence, applicant plotted to commit the robbery, and he was the leader of the pack. Applicant told a very different story. He had no idea that Kevin Shaw was planning to go to the Taco Bell that night, much less commit a robbery or a murder. Applicant was "a Good Samaritan" who snatched the bloody knife away from Kevin and took it out the door.

In sum, the State painted an evidentiary picture of Mr. Hyde; applicant presented a portrait of Dr. Jekyll. Both of these versions could not be true. The jury believed the State's version, but applicant's testimonial version of the events did not betray any lack of mental acuity. His testimony was clear, coherent, concise and consistent. He responded nimbly and held his own when the prosecutor cross-examined him.

The closing arguments at the punishment stage carried out the "Dr. Jekyll and Mr. Hyde" dichotomy. The State again emphasized the fact that the Taco Bell robbery-murder was applicant's idea. He knew Jennifer and he used his "charm" to get inside; then he hugged her. Her murder was premeditated. He showed no remorse: after the murder, he matter-of-factly told his friends that "we had to shoot a girl," and his only concern was getting rid of his bloody jacket. The State referred to the prior aggravated assault of Chris Standmeir to show his continuing violence and to the prior possession of ten packets of cocaine to show his general lack of lawful conduct as well as his motive for the robbery.

The defense emphasized applicant's relative lack of prior criminality and his possible redemption and rehabilitation:

The law answers those questions no, and only the evidence from that table can persuade you, if it can, to change those no answers to yes on those questions. That's the way the law works. Some of you said that you'd use it only as a last resort, only for habitual criminals who could not possibly be rehabilitated.... You said you would consider his track record, the kind of person he was deep down inside.

. . .

Continuing acts of violence. Is he a continuing threat to society? On *voir dire*, almost all of you told us that you were looking for someone who had a long criminal record, that's in and out of the penitentiary, someone who cannot be rehabilitated.... This boy has not spent one day in the penitentiary.

The defense argued that "it's not too late for LaRoyce." It pointed to the fact that many witnesses had testified that he was "no problem" in school or at home. The defense mentioned applicant's family life: "I think it would take a fool to not think that the things that were going on in that family when their daddy was selling their appliances for crack is not going to have any impact at school." The defense focused on how much worse applicant's cohort, Kevin, was and how he had a much worse background than applicant. He emphasized that applicant did not kill Travis, the other eyewitness, and if he were so terrible, he would have done so. The defense spoke of the mitigating evidence:

I want to talk to you about mitigating evidence. Mitigating evidence is that evidence that reduces the defendant's personal or moral culpability and may include, but is not limited to, any aspect of his character, record, background, or circumstances of the offense. It may go to one of the special issues, it may not, but the court tells you that the State has

a burden that if you think that he should not die, you are to put "no" in one of the spaces, that the State has the burden of proof beyond a reasonable doubt to convince each and every one of you that he should still die.

He spoke of applicant's I.Q.:

The evidence we have, medical diagnosis, slow learner, may be organic. Objective test data, I.Q. 78. He is eight points from being mentally retarded. Why do you think LaRoyce gets along so well with kids? Because he's like one, that's why. Because he's like one. . . . It shows he is not a leader [like Kevin Shaw], it shows he's a follower.

He spoke of the family problems:

Family problems. [The prosecutor] will say, "Well, we've all had problems and many of us have been raised by single parents." That's true, but how many of us have had our daddies sell our appliances for crack, that we've had to take and hide our V.C.R.'s, our T.V.'s, our freezers, so our own daddy wouldn't go and sell it for crack? You know that that has an impact on someone. It has an impact on how they act in school.

He noted the prodigious number of defense witnesses:

The numbers do mean something, how many of us could say if we were in trouble that we could have that many people come and say something good? These people know him. You have known him for eight days. They have known him for their life. They say he should not die. He is not evil. That's not the only thing you can do with him . . . . there is something good about LaRoyce. There is something worth saving. . . . They tell you he can be rehabilitated. Is he the worst of the worst? Is he someone who can't be rehabilitated? Has the State proven beyond a reasonable doubt that in spite of this over-whelming mitigating evidence, that he still needs to die, that there is nothing else we can do with him or to protect society, that you have to exterminate him like you would a stray dog or cat?

He spoke of remorse:

Reasonable deduction from the evidence, he has learned and has remorse. Why would he cry in front of the minister when he talked about the girl?

. . .

The State of Texas must prove to you beyond a reasonable doubt that the death sentence should be imposed despite the mitigating evidence. You shall answer no to one of the issues to give effect to your meaning. LaRoyce's life is in your hands, no question about that. . . . These people didn't get up here because they didn't have anything to do and wanted to have a quick thrill in the courtroom. They testified and came down here because they wanted to tell you there is something worth saving.

Both the State and defense presented vibrant and compelling arguments for and against the two special issues and the nature and quality of the mitigating (and aggravating) evidence. The primary theme of the defensive evidence and closing argument was that LaRoyce Smith was a young man whose life was worth saving. He had triumphed over such disabilities as being a slow learner with family troubles, and had proven himself a role model to other family members and friends. His pastor spoke on his behalf, as did his mother, brother, fiancee, and fiancee's mother. All were certain that he would not pose a risk of violence in the future: "What LaRoyce needs is a controlled environment."

In its final argument, the State reminded the jury that they knew applicant was no dummy. He noted:

The I.Q. testing, and that's why we when we see the records and it shows his I.Q. is 78, we introduce the rest of the packet and we examine that and we find that his I.Q. is close to 90 on other testing within that file. That's for your consideration, but I ask you to judge him by his testimony, by his street-smartness and by his testimony that he gave. Nobody is going to fool LaRoyce Smith on the witness stand. I mean, he is not a bumbling fool. He is an intelligent individual and he so testified. No argument there, I would think.

The State began its closing argument with the following:

Now, when we talked to you on voir dire, we talked to you about—and we spent a lot of time talking to you to determine whether or not you could follow the law. You told us two very important things when we talked to you. First of all, you told us that in the appropriate case that you could give the death penalty. Secondly, you said, "Mr. [prosecutor], Ms. [prosecutor], if you prove to me that the answers to those special issues should be yes, then I can answer them yes." If you wavered, if you hesitated one minute on that, then I guarantee you, you weren't going to be on this jury. We believed you then, and we believe you now.

Significantly, the prosecutor never suggested that the jury should ignore or fail to consider any of applicant's mitigation evidence in deciding whether the answer to those special issues should be "yes" or "no." Of course, the prosecutor properly focused upon the evidence that would support a "yes" answer to both special issues, just as the defense had properly focused upon the evidence that would support a "no" answer to those special issues. The

prosecutor concluded his remarks with the following:

Ladies and gentlemen, I'm going to be sitting down in just a few minutes. The case is going to be in your hands. When we talked to you on jury selection, we talked to you—we told you at that time what we felt the facts were going to call for, that this was an individual where the ultimate punishment is earned by him over the years. The brutality of this particular case standing alone, if you absolutely knew nothing else about LaRoyce Smith and his background, the brutality alone calls for the death penalty in this case. So, please this is the time to have compassion, not for this individual, not for this outlaw, but for the victim and the victim's family. We'd ask you to consider that.

Thank you, Your Honor.

The prosecutor never suggested that applicant's mitigation evidence should be ignored, that it did (or did not) fit into the two special issues, or that once the jury truthfully answered the special issues, it should ignore applicant's other mitigation evidence.

Although the jury ultimately answered the special issues in a way that required the trial judge to impose the death penalty, we are unable to conclude that the statutory special issues and nullification instruction caused applicant "egregious harm" in its effect upon the jury's deliberation of his mitigating evidence. Applicant fails to provide any persuasive argument that the jury was unable to consider the totality of his extensive mitigating evidence, to appreciate his punishment theme, or to take into account the specific evidence of his relatively low I.Q. test at the age of thirteen, his participation in a special education reading program and speech therapy, or his troubled family

background.[42] The basic defense theme was that he had triumphed over these youthful difficulties; he did not succumb to them. That is the strategy that his attorneys chose, and this is an approach that a jury might find persuasive.

Applicant's defensive evidence and theme created a very different picture of applicant than the evidence and theme that concerned the Supreme Court in *Penry*. In the latter case, the Supreme Court was troubled by Penry's "two-edged sword" evidence—the fact that he was mentally retarded was mitigating, but the fact that he was, therefore, unlikely to learn from his mistakes and incapable of rehabilitation or reformation, was aggravating.[43] Here, however, the defense was able to weave applicant's evidence of mental impairment, youth, and family background into a dramatic account of his humanity and triumph over adversity. It provided evidentiary support for defense counsel's well-crafted closing argument that "he has learned and has remorse" and thus he is "worth saving."

It is possible that the two special issues may not have fully and completely encompassed every single bit of applicant's mitigation evidence and he may have suffered "some" actual harm. However, we do not find that the deficient charge was so egregiously injurious to his right to have the jury consider and evaluate all of his mitigation evidence that he did not receive a "fundamentally fair trial."[44] All of his mitigating evidence was admitted, defense counsel did a superb job of weaving all of that evidence into a compelling theory of the case, and his attorneys presented a strong, coherent, and persuasive closing argument on punishment. We therefore conclude that applicant has failed to show, by a preponderance of the evidence, that the unobjected-to jury nullification instruction caused him "egregious harm." We deny relief.

HERVEY, J., filed a concurring opinion in which KEASLER, J., joined.

HOLCOMB, J., filed a dissenting opinion.

MEYERS, J., not participating.

HERVEY, J., filed a concurring opinion in which KEASLER, J., joined.

Applicant has raised only an unpreserved federal constitutional claim that the two statutory special issues and the non-statutory "nullification" instruction at his 1991 capital murder trial did not provide the jury with a vehicle to give appropriate effect to applicant's mitigating evidence. This Court disposes of this unpreserved

---

**42.** Applicant's position is that all *Penry* jury charge error is structural and thus immune from any harmless error analysis. This position conflicts with well-established Texas law under *Almanza*. It is inconsistent with our most recent decision in *Penry v. State*, 178 S.W.3d 782, 788 (Tex.Crim.App.2005). It would appear that, under Supreme Court precedent as well, *Penry* error is subject to review for harmless error. *See Brown v. Payton*, 544 U.S. 133, 125 S.Ct. 1432, 1452, 161 L.Ed.2d 334 (2005) (Souter, J., dissenting) (disagreeing with plurality which found no *Penry*-type error; concluding that the error was harmful under federal habeas standard set out in *Brecht v. Abrahamson*, 507 U.S.

619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)); *see also Calderon v. Coleman*, 525 U.S. 141, 144–46, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998).

**43.** *Penry I*, 492 U.S. at 323–24, 109 S.Ct. 2934 ("Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future" because "one effect of his retardation is his inability to learn from his mistakes").

**44.** *Almanza*, 686 S.W.2d at 172.

claim on an independent state ground under our state-law "egregious harm" standard for "unobjected-to jury-charge error." [1] *See Jimenez v. State*, 32 S.W.3d 233, 237–39 (Tex.Cr.App.2000). This essentially is the same review for unpreserved issues in the federal system. *See Jimenez*, 32 S.W.3d at 238; *see also United States v. Olano*, 507 U.S. 725, 730–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

The Court's opinion asserts that applicant could theoretically have suffered "some" actual harm from the "deficient" charge because the "two [statutory] special issues may not have fully and completely encompassed every single bit of applicant's mitigation evidence." *See Smith*, op. at 472. [2] The Court nonetheless decides that applicant suffered no "egregious harm" from the "deficient" charge because the jury could still have meaningfully (though not fully) considered any mitigating evidence within the context of the two statutory special issues under the circumstances of this case. *See Smith*, op. at 472 (applicant fails to provide any persuasive argument that the jury was unable to consider the totality of his extensive mitigating evidence, to appreciate his punishment theme, or to take into account the specific evidence of his relatively low I.Q. test at the age of thirteen, his participation in a special education reading program and speech therapy, or his troubled family background). [3]

I would decide, however, consistent with the United States Supreme Court's decision in *Johnson v. Texas*, that the Constitution requires only that a jury be provided with a vehicle to meaningfully consider mitigating evidence and not, as the Court's opinion seems to decide, a vehicle to "fully and completely" consider mitigating evidence. *See Johnson v. Texas*, 509 U.S. at 354, 368–72, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (Constitution requires only that a jury have some "meaningful basis" to give effect to mitigating evidence not that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant"). [4]

---

1. *See Ex parte Smith*, S.W.3d slip op. at 2 (Tex.Cr.App. No. AP–74,228, delivered this date) (op. on remand from United States Supreme Court).

2. This apparently is the reason the Court considers the charge to be deficient; *i.e.*, the charge did not provide the jury with a vehicle to "fully" consider some mitigating evidence.

3. The Court's opinion also states, *Smith*, slip op. at 472:

    It is possible that the two [statutory] special issues may not have fully and completely encompassed every single bit of applicant's mitigation evidence and he may have suffered "some" actual harm. However, we do not find that the deficient charge was so egregiously injurious to his right to have the jury consider and evaluate all of his mitigation evidence that he did not .receive a "fundamentally fair trial." [Footnote omitted]. All of his mitigating evidence was admitted, defense counsel did a superb job of weaving all of that evidence into a compelling theory of the case, and his attorneys presented a strong, coherent, and persuasive closing argument on punishment. We therefore conclude that applicant has failed to show, by a preponderance of the evidence, that the unobjected-to jury nullification instruction caused him "egregious harm."

4. Footnote 4 of the Court's opinion in this case cites to former Justice O'Connor's 5–4 decision in Part III–B of *Penry v. Johnson*, 532 U.S. 782, 797, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*), which quotes from her dissenting opinion in *Johnson*, for the proposition that a jury must have a vehicle to give *"full* consideration and *full* effect to mitigating" evidence. *See Smith*, slip op. at 457 n. 4 (emphasis originally in *Penry II* and *Smith*). Such a rule, however, would "effec[t] a sea change" and require a significant alteration in the Supreme Court's capital sentencing jurisprudence as very thoroughly discussed in Justice Kennedy's majority opinion for the Court in *Johnson*, 509 U.S. at 365–

Since the two statutory special issues provided applicant's jury with a vehicle to meaningfully consider applicant's mitigating evidence, there was no deficient charge (i.e., no error) and consequently applicant could have suffered **no** harm, particularly if the Supreme Court's decision in *Johnson* is still good law. *See also Ex parte Smith,* 132 S.W.3d 407, 427–28 (Tex.Cr.App.2004) (Hervey, J., concurring). Under these circumstances, the additional, nonstatutory "nullification" instruction was completely gratuitous and could only have benefitted applicant by providing the jury with another vehicle to consider any mitigating evidence more fully than what *Johnson* and the Constitution require. *See id.*

So, even if the law requires that a jury be provided with a vehicle to "fully and completely" consider mitigating evidence,[5] the "nullification" instruction, particularly with the way that it was carefully explained to the jurors during voir dire, accomplished this. *See Smith,* 132 S.W.3d at 427–28 (Hervey, J., concurring). Since we are disposing of this case on an independent state ground, we are not bound by the view expressed in *Penry II,* 532 U.S. at 801–02, 121 S.Ct. 1910 that Texas jurors are incapable of remembering, understanding and giving effect to the straightforward and manageable "nullification" instruction such as the one in this case. *See Smith,* 132 S.W.3d at 427 (Hervey, J., concurring).

I concur in the Court's judgment to deny habeas corpus relief.

HOLCOMB, J., filed a dissenting opinion.

I respectfully dissent. The majority misapprehends the plain directive of the United States Supreme Court in its reversal of this court: precisely, apply a harm analysis to Eighth Amendment error because "the nullification instruction was constitutionally inadequate under *Penry II*", effectively preventing the jury from giving full effect to Smith's relevant mitigating evidence.[1] *Smith v. Texas,* 543 U.S. 37, 48–49, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (*per curiam*). With the following comments, I dissent from the denial of habeas corpus relief.

*Procedural Default*

Although I was once persuaded to believe otherwise, Smith's federal constitutional claim that he was denied an effective vehicle by which a jury could consider and give effect to his mitigating evidence was not procedurally defaulted. *See Ex parte Smith,* 132 S.W.3d 407, 428 (Tex. Crim.App.2004) (HOLCOMB, J., concurring and dissenting). The majority appears to hold that, although Smith presented three written pre-trial motions upon his Eighth Amendment objection, his objection lacked the requisite specificity under our state-law error preservation rules, and therefore, his claim was procedurally defaulted. *See* Maj. op. *supra* at 462 & n. 9. And despite the fact that *Penry II* had yet to be decided, the majority holds that Smith's failure to object under the precise reasoning of *Penry II* is now fatal to his

---

73, 113 S.Ct. 2658. It would be very difficult to conclude that *Penry II* overruled all of this jurisprudence, particularly *Johnson,* without expressly saying so. It would be even more difficult to conclude that Justice Kennedy, in joining Part III–B of former Justice O'Connor's opinion in *Penry II,* repudiated *sub silentio* the position that he so very thoroughly set out in *Johnson.*

5. *But see Johnson,* 509 U.S. at 372, 113 S.Ct. 2658 (Constitution does not require that "a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant").

1. *Penry v. Johnson,* 532 U.S. 782, 798, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*).

constitutional claim. Maj. op. *supra* at 462. Specifically, the majority faults Smith for arguing only that the applicable statute was unconstitutional as applied under *Penry I*[2], and thus, his failure to further object to the verbal nullification instruction, when invited to do so by the trial court, waived his *Penry II* claim. *See* Maj. op. *supra* at 462 & n. 9.

It should go without saying that a defendant does not waive his right to assert a constitutional violation by failing to object at trial if, at the time of his trial, that right had not been recognized. *Ex Parte Taylor*, 484 S.W.2d 748, 752 (Tex.Crim.App. 1972) (citing and explaining *United States v. Liguori*, 430 F.2d 842, 847 (2d Cir. 1970)). Because *Penry II* had not been decided by the Supreme Court at the time of Smith's trial, it would have been a superhuman feat indeed to specifically object that the verbal nullification instruction itself was inadequate to remedy the *Penry I* problem in his case and why (that the nullification instruction creates a situation whereby jurors would face an intractable ethical dilemma).[3] Smith should not be faulted for failing to anticipate the action of the United States Supreme Court. *See Liguori*, 430 F.2d at 847. Thus, the majority's reasoning that Smith did not preserve error cannot be countenanced, and further, it is not supported by the record.

The record reflects that Smith brought the Eighth Amendment error to the attention of the trial court, that the trial court understood his objections, and his objections were made with the requisite specificity to preserve error under Texas Rule of Appellate Procedure. 33.1 and the cases

construing it. For example, in two pretrial motions, Smith argued that:

- the Texas death penalty "statutory scheme may become unconstitutional as applied if the defendant offers mitigating evidence about his background or character or the circumstances of the crime that are not relevant to the special verdict questions or have relevance to the Defendant's moral culpability beyond the scope of the special verdicts" (citing *Penry I*) (Clerk's Record at 73–74);

- "Tex.Code Crim. Proc. is Ann. Art. 37.071 is unconstitutional because it does not provide for the introduction and subsequent use by the jury of mitigating evidence which is not relevant or material to the special issues. There is no provision in Texas for the jury to decide the appropriateness of the death penalty taking into consideration the personal moral culpability of the Defendant balanced by mitigating evidence which is not directly or circumstantially probative in answering the special issues. There is no provision in the current statutory scheme for the jury to render its verdict that the death penalty should not be inflicted because of mitigating evidence of this type." (Clerk's Record at 80).

The majority unfairly characterizes Smith's arguments as broad-based objections to the statutory scheme and the court's charge that no possible instruction could cure, and faults Smith for failing to offer suggestions to the trial court about

**2.** *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (*Penry I*) (remanding for new punishment hearing without assessing harm).

**3.** We recently held that the *Penry II* nullification problem was not recognized at the time of a similarly situated capital defendant's trial and remanded the cause to the convicting court for consideration of the claim. *See Ex parte Robertson*, AP–74,720 * 23 (Tex.Crim. App. March 16, 2005) (not designated for publication).

how, in his view, the nullification instruction should be worded. To say the least, however, the state of the law concerning the special issues was in disarray at the time of trial, and the arguments Smith made pertaining to the special issues were clearly sufficient to apprise the trial court of his federal constitutional claim under *Penry I.* In declaring otherwise, the majority is merely splitting hairs to avoid applying the proper beyond-a-reasonable-doubt standard[4] to his meritorious federal claim. *See Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App.1992) ("no technical considerations or form of words" are required to preserve error for review, and straightforward communication in plain English will always suffice if it lets the trial judge know what the party wants and why he thinks himself entitled to it); TEX. R.APP. P. 33.1. Whatever we require of lawyers in Texas with respect to the rules of error preservation, we should not hold that they must be clairvoyant. *See Liguori,* 430 F.2d at 847. Because *Penry II* had not been decided and there was no enactment by the Legislature in response to *Penry I,* this is exactly what the majority requires from this lawyer. The record reflects that counsel went above and beyond what was required of him to preserve error under TEX.R.APP. P. 33.1 and TEX. CODE CRIM. PROC. ANN. art. 36.14.[5]

I also find compelling Smith's argument in reply to the State's new position that Smith did not preserve error. That is, if Smith had offered particular wording or a proposed charge on mitigation, and that instruction was later declared to be inadequate under the yet-to-be-decided *Penry II* case, Smith would have invited the error and no relief could have been subsequently granted to him because of his acquiescence to the error. *See* Applicant's Reply Brief on Remand at 3 n.*; (Reporter's Record Vol VI at 3–4). It is puzzling to me that the majority thinks the better course for trial counsel was, in this unique and difficult situation, to create an estoppel-type-invited-error problem himself by suggesting, at the invitation of the trial court, further changes to the nullification instruction. *See also* TEX.CODE CRIM. PROC. ANN. art. 36.14.[6]

Moreover, as this exchange reflects, the trial court understood Smith's motions as a request for a sufficient mechanism to allow the jury to consider and give effect to his mitigating evidence.

> The Court: The two motions to declare Texas Code of Criminal Procedure Annotated, Article 37.071, Section 3701 unconstitutional as applied, I read those and ... put them in my mind together. Is there anything not included in those two motions that you wish to supplement orally?
>
> Trial Counsel: No, Your Honor.
>
> Trial Court: Those will have to be denied.

---

4. *Beathard v. State,* 767 S.W.2d 423, 432 (Tex. Crim.App.1989).

5. Providing in part that "the defendant or his counsel shall have a reasonable time to examine the [proposed charge] and he shall present his objections thereto in writing, distinctly specifying each ground of objection. Said objections may embody errors claimed to have been committed in the charge, as well as errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts."

6. The rule governing objecting to the charge provides that Smith was not required to do what the majority suggests he should have done. "[A]nd *in no event shall it be necessary for the defendant or his counsel to present special requested charges to preserve or maintain any error assigned to the charge,*" as herein provided. *See* TEX.CODE CRIM. PROC. ANN. art 36.14 (emphasis added).

Smith further explained the potential for error in his Motion to Reveal Mitigation Charge, "[s]ince ... *Penry* the Texas Legislature has met in several sessions but has failed to address the problems and issues created by the decision ... [and the] Court of Criminal Appeals has had numerous opportunities to address the problem raised in *Penry* and has failed to do so in any written opinion." (Clerk's Record 87–88). Thus, the record clearly reflects that Smith's arguments before the trial court, if not explicitly stating that the nullification instruction was an inadequate remedy to cure his *Penry I* complaint, they were precise enough to put the trial court on notice, particularly since there was no statute or case law to look to for guidance. *See Taylor v. State,* 939 S.W.2d 148, 154–55 (Tex.Crim.App.1996) (grounds of objection, while imprecise, were apparent from the context). The majority's reasoning to the contrary, utilizes an arbitrary and unfair "hair-splitting analysis" to bar consideration of Smith's claim on the merits. *See Lankston,* 827 S.W.2d at 909, 911 (concluding that it was clear from context that both judge and prosecutor understood the defendant's objection).

Our state preservation of error laws may not be applied to avoid addressing substantive claims in violation of federal law. *See, e.g., Washington v. Texas,* 388 U.S. 14, 22–23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Nor do I believe that this court may attempt to avoid reversal by cloaking federal constitutional error or harm in purportedly "independent and adequate state law grounds." *See* Concurring op. *supra* at 472–73; *cf. Kunkle v. Texas,* 543 U.S. 1039, 125 S.Ct. 818, 160 L.Ed.2d 605 (2004) (Stevens, J., concurring) (noting that Supreme Court did not have jurisdiction to consider Kunkle's *Penry* claim because it was barred under an independent and adequate state ground, i.e., TEX.CODE CRIM. PROC. ANN., Art. 11.071,

§ 5). "Random or inconsistent application of state rules of procedural default will not be regarded as 'adequate and independent state law grounds' so as to bar decision in federal habeas review." *Ex parte Gardner,* 959 S.W.2d 189, 193 (Tex.Crim.App. 1996) (CLINTON, J., dissenting) (citing *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)). Thus, contrary to the concurring judge's reasoning, *see* Concurring op. *supra* at 472–73, we cannot avoid federal review by now holding that Smith did not preserve error because "the question of when and how defaults in compliance with state procedural rules can preclude [federal court's] consideration of a federal question is itself a federal question." *See Henry v. Mississippi,* 379 U.S. 443, 447, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

Furthermore, a state procedural ground is not adequate unless the procedural rule is strictly or regularly followed. *Barr v. City of Columbia,* 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964). *Barr* is instructive on this point. In *Barr,* the Supreme Court declined the invitation to hold that Petitioners did not preserve error on their constitutional claims because the state supreme court "refused to pass on objections" as "the exceptions taken below were 'too general to be considered[.]'" *Id.* In reaching its decision that it was not barred from reviewing the state court's decision, the Court considered the state court's recent treatment of similar cases. *See id.* at 149–50, 84 S.Ct. 1734. Finding that the state court had addressed the merits in five cases, where either identical or similar objections were made below, the Supreme Court concluded it was not prohibited from reviewing the claims on the merits. *See id.*

Our application of error preservation rules, as of late, have been applied capri-

ciously and arbitrarily by this court;[7] therefore, a self-proclaimed "adequate" procedural bar cannot insulate the majority's holding from federal review. *See Henry v. Mississippi,* 379 U.S. at 447, 85 S.Ct. 564; *Barr v. City of Columbia,* 378 U.S. at 149, 84 S.Ct. 1734. It appears to me that this court has been (and clearly is in this case) improperly applying procedural bars to avoid granting substantive relief to defendants who are perhaps guilty but are otherwise entitled to the relief sought. The rule of procedural default should not be used as an ad hoc mechanism to avoid reaching the merits of a particular case.

And perhaps more significantly, this Court has already addressed the merits of Smith's claim twice: once on direct appeal, *LaRoyce Lathair Smith v. Texas,* No. 71,-333 *10–11 (Tex.Crim.App.1994) (not designated for publication), and also in our initial resolution of this very case. *See Ex parte Smith,* 132 S.W.3d at 416 (declining to impose procedural bar and addressing merits of Smith's claim); *see also* Maj. op. *supra* at 462 & n. 10 ("We rejected [Smith's direct appeal] claim and held that . . . the trial judge's supplemental instruction provided a sufficient vehicle for the jury to fully consider all of that evidence"); *see* Applicant's Reply Brief at 2 n.* (noting that the State has taken mutually exclusive positions throughout the case regarding error preservation). Because our holding was reversed by a higher court, a court which addressed the merits and found our

holding on the merits to be erroneous, we may not now remedy the problem by failing to address the merits, and instead, decide that the substantive complaint was not preserved. *See United States v. Wells,* 519 U.S. 482, 487–88, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (acknowledging law of the case doctrine); *Granviel v. State,* 723 S.W.2d 141, 147 (Tex.Crim.App.1986) (same).

*Obiter Dicta to Support Harmless Error*

I disagree with the majority that it is arguable the Supreme Court did not "disapprove of" this Court's alternative holding "that the two special issues provided applicant's jury with a constitutionally sufficient vehicle to give effect to his mitigating evidence." *See* Maj. op. *supra* at 457, 463. I believe the Supreme Court spoke quite clearly, holding, *inter alia,* that "just as in *Penry II* . . . findings of deliberateness and future dangerousness . . . had little, if anything, to do with the mitigation evidence [Smith] presented." *See Smith v. Texas,* 543 U.S. at 48, 125 S.Ct. 400.[8] Thus, there can be no reasonable conclusion that we were ordered to address anew whether there was error. *See Penry v. Johnson,* 532 U.S. at 798, 121 S.Ct. 1910 (*Penry II*) ("we made clear in *Penry I,* none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse"); *Penry v. Johnson,* 215 F.3d 504, 514 (Den-

---

7. For example, this court has become more and more willing to apply procedural bars to substantive complaints that were clearly preserved in the trial court, particularly where the substantive claim had merit and the defendant, by all accounts, was an unappealing recipient of relief. *See, e.g., Keeter v. State,* 175 S.W.3d 756 (Tex.Crim.App.2005) (holding that *Keeter* did not preserve error on a *Brady v. Maryland* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] claim, even though objection, written motion, and testimony were

elicited before trial court in indecency with a child case); *Reyna v. State,* 168 S.W.3d 173, 176–77 (Tex.Crim.App.2005) (applying a "less common notion of error preservation" to indecency with a child case).

8. Because the Supreme Court has told us that Smith's mitigating evidence had little or no relation to the other special issues, the cases cited by the majority to support the contrary have no relevance to this proceeding. *See* Maj. op. at 465–67 & n. 34–37.

nis, J., dissenting) (Penry's mitigating evidence was shackled and confined within the scope of the three special issues). While our initial conclusion may not have been expressly disavowed by the Supreme Court, it was implicitly rejected. Reversed means reversed. *Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

The majority's reasoning on the question of error is *obiter dictum*, and therefore, has no precedential value. But it does serve the distinct purpose of allowing the majority to weave into its harm analysis the disavowed conclusion that the two special issues submitted sufficiently encompassed Smith's mitigating evidence. *See* Maj. op. *supra* at 472. However, our judicial power does not include the power to issue advisory opinions and ignore orders from the Supreme Court.[9] *Ex parte Ruiz*, 750 S.W.2d 217, 218 (Tex.Crim.App.1988).

*The Proper Harm Analysis*

Not only does the majority overstep its bounds by deciding a question it is not authorized to consider, *see id.*, it further commits error by applying a state-law non-constitutional harm analysis to federal constitutional error. Specifically, because the majority now suddenly thinks that Smith did not preserve error in the trial court—despite the fact that the majority once rejected the procedural default argument and twice addressed his claim on the merits, the majority applies our burdensome state-law "egregious harm" analysis to Smith's Eight Amendment claim. *See* Maj. op. at 463–64; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984).

The majority's decision to apply our framework for unpreserved error in the jury charge is wrong for at least two reasons. First, simply because the manifestation of Smith's Eighth Amendment violation stemmed from the failure to include an instruction in a written jury charge, that Eighth Amendment claim does not therefore become a lesser state-law claim that we may dispose of under the less stringent standard of review for mere jury charge error. *Beathard v. State*, 767 S.W.2d at 432 (citing *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and explaining that the application of a state harmless-error rule is a state question when it involves only errors of state procedure or state law); *see also Jimenez v. State*, 32 S.W.3d 233, 236–37 (Tex.Crim.App.2000). Nor could we say, similarly, because the constitutional error was created by an omission in the jury charge, the proper review would be that reserved for non-constitutional errors. *See* Tex.R.App. P. 44.2(b) ("any [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *see also Almanza*, 686 S.W.2d at 171–72 (unpreserved error in the jury charge is reviewed for egregious harm).

Second, because the error *was* preserved, we should apply the harmless error standard in Tex.R.App. P. 44.2(a). *See Beathard v. State*, 767 S.W.2d at 432 (noting that our appellate procedure rule provides the same standard as the rule enunciated in *Chapman v. California*, i.e., before federal constitutional error can be held harmless, the court must be able to

---

**9.** Despite its recognition of the Supreme Court's conclusion that the nullification instruction here was more confusing to the jury than the state court assumed, the majority explains while it was "indeed a possibility" that the nullification instruction intensified the dilemma for ethical jurors, the record does not reflect that any juror, party, or the judge so expressed this notion on the record. Maj. op. *supra* at 468. This, however, does not mean that confusion did *not* occur in the jury room where it was most likely to happen.

declare a belief that it was harmless beyond a reasonable doubt). Rule 44.2(a) provides that "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Because the error here was a violation of the federal constitution that did not amount to a structural defect, we must determine whether it was harmless beyond a reasonable doubt. *See Jimenez,* 32 S.W.3d at 237. The majority errs in failing to do this.

In finding no *egregious* harm under the state-law *Almanza* standard for errors in the written charge, the majority denies relief. Contrary to its analysis, it is of no moment to conclude that the two special issues embraced most of Smith's mitigating evidence. The Supreme Court held the nullification instruction was "constitutionally inadequate" to allow that evidence to be considered under the charge Smith received. This is particularly true since the Supreme Court indicated that most of the mitigating evidence was similar to Penry's mitigating evidence. *Smith v. Texas,* 543 U.S. at 48, 125 S.Ct. 400 ("just as in *Penry II,*" deliberateness and future dangerousness had little to do with the mitigating evidence Smith presented). In other words, it is not possible that the special issues adequately channeled Smith's mitigating evidence to the jury because the nullification instruction itself "intensified the dilemma faced by ethical jurors," and as a consequence, choked off at the source any ability to express a reasoned moral response to the evidence. Because there was no principled distinction between Smith's instruction and Penry's, all of Smith's mitigating evidence was "shackled and confined" within the scope of the special issues. *See id.* at 47–48, 125 S.Ct. 400.

Similarly, that Smith did not suffer egregious harm because of the well-presented argument and the jury's perception of the evidence (whether aggravating, double-edged sword, or mitigating), is beside the point because in the absence of a vehicle—a proper mitigation question—the jury had no way to express its reasoned moral response to the *argument* in mitigation and the *evidence* in mitigation. In other words, even if the jury was persuaded by the "Dr. Jekyll" argument and the "Dr. Jekyll" evidence, *see* Maj. op. *supra* at 469, the jury could not give any consideration or effect to it because it had no way to do so.

Lastly, the majority improperly places the burden of proof on Smith to show harm. *See* Maj. op. *supra* at 472 (applicant fails to provide any persuasive argument that the jury was unable to consider the totality of his extensive mitigating evidence). As we said in *Ovalle v. State,* 13 S.W.3d 774, 787 (Tex.Crim.App.2000), no party should have the burden to prove harm from an error, as there is no way to prove "actual harm." Burdens and requirements of proving "actual facts" are appropriate in the law of evidence, but they have little meaning for the "harmless-error decision."

*Conclusion*

I would hold that, under the proper harmless error standard, Tex.R.App. P. 44.2(a), we must order habeas corpus relief. Based on the quantity and quality of Smith's mitigating evidence, to which the jury had no means to consider and give effect, I cannot say that the Eighth Amendment error was harmless beyond a reasonable doubt.

I respectfully dissent.