IN THE COURT OF CRIMINAL APPEALS


OF TEXAS








NOS. PD-1933-04, 1934-04, 1935-04




RAYMOND OLIVAS, Appellant



v.



THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE TENTH COURT OF APPEALS


BRAZOS COUNTY





 Cochran, J., delivered the opinion of the Court in which Keller, P.J.,
Price, Womack, Johnson, Keasler, Hervey and Holcomb, JJ., joined. Meyers,
J., not participating.

 

O P I N I O N 




 Four times, in less than a month, appellant evaded arrest by outracing Bryan or
College Station police officers who were attempting to arrest him for stalking and assaulting
his former girlfriend. A jury convicted appellant of all four evading arrest charges, and it
found that he used his mother's Pontiac Bonneville as a deadly weapon during three of those
offenses. The court of appeals rejected appellant's claims of legal and factual sufficiency,
but it then found unassigned, fundamental, "structural" error in the jury charge because the
special issue did not explain that the State had the burden to prove, beyond a reasonable
doubt, that appellant used his mother's car as a deadly weapon. (1) The court of appeals
reversed the judgment in the three evading arrest cases that contained deadly weapon
findings and remanded those cases for a new trial. Finding that the unobjected-to error in the
jury charge did not cause appellant "egregious harm" under Almanza, (2) we reverse the court
of appeals and affirm the trial court's judgment. (3)

I.


 Kim Tunnell, married with two children, had an affair with appellant. She broke off
this relationship to save her marriage, but appellant did not want to end the affair. He
constantly called Ms. Tunnell's cell phone, leaving voice messages first of love, then of
anger, and finally of threats. 

 On November 27, 2001, Ms. Tunnell received a voicemail message in which appellant
told her that if she didn't come out of her house, he would break the door down. Fearing
violence, Ms. Tunnell decided to ask the police for help. She recorded the 59 voice messages
that appellant had previously left. While she was doing so, appellant called again and told
Ms. Tunnell to "count her friggin' hours." 

 She went to the Bryan Police Department office, reported the telephone harassment,
and left the recorded messages with them. At the suggestion of the police, Ms. Tunnell then
went to her attorney's office to obtain a restraining order against appellant. As she pulled
into the attorney's parking lot, she saw appellant walking "briskly" toward her truck. She
began to back out of the parking lot, but, as appellant reached the passenger side of the truck,
he pulled out a pistol and "tried to break the passenger side glass." The window did not
break, but Ms. Tunnell, who had never seen appellant with a gun before, fled in her truck. 
Eventually, she drove back to the attorney's office, and he called the police.

 Motorcycle Officer John Agnew responded to that call, got a description of the car
appellant was driving, and soon saw that car, a beige Pontiac Bonneville registered to
appellant's mother, at the Tobacco Barn, a nearby gas station. The driver of the Pontiac saw
Officer Agnew behind him, so he got into the car and "immediately started rolling." Officer
Agnew followed, turning on his lights and siren as the driver picked up speed. The Pontiac
went into the oncoming traffic lane as its driver cut around a sharp curve trying to escape. 
Once around the curve, the "vehicle just punched it, just took off as fast as it could down
MLK" Street. The driver was going a minimum of 50 m.p.h. in a 30 m.p.h. zone. Officer
Agnew knew that he needed to stop the Pontiac "quickly before someone gets hurt." The
driver again swerved into the oncoming traffic to pass another car in his lane. Officer Agnew
testified that the Pontiac, being driven in this manner and at that speed, "was definitely
capable of causing serious bodily injury to somebody." Officer Agnew discontinued his
pursuit because the Pontiac was "getting way too fast" for him on his motorcycle.

 On December 12th, as Ms. Tunnell was driving to the laundromat, appellant drove up
behind her in his mother's Pontiac and she heard two "pop" sounds as he pulled the Pontiac
up alongside her truck. She called the police on her cell phone as soon as she arrived at the
laundromat and discovered a fresh bullet hole in the driver's side of the extended cab. 
Officer Alvarez responded and found Ms. Tunnell crying and "stomping around" in anger
and fear. She told Officer Alvarez that appellant had tried to shoot her. Officer Alvarez
examined the truck and found that the bullet had penetrated the truck; he found the bullet
fragments in a blanket on the seat. After completing his investigation, Officer Alvarez
returned to the police station, but he was soon notified that appellant had called Ms. Tunnell
again, this time from a pay phone at a local store, Sloppy Joe's. (4) Officer Alvarez got back
into his patrol-car and was headed toward Sloppy Joe's when he saw the Pontiac pass him. 
He pulled in behind the Pontiac, turned on his patrol-car video recorder, and called for
additional units to stop the car. The Pontiac turned into the same Tobacco Barn gas station
where Officer Agnew had first spotted it two weeks earlier. Once Officer Alvarez turned on
his lights to make a stop, the Pontiac accelerated, went around the building and through the
parking lot at a high rate of speed, and then turned onto MLK Street. Officer Alvarez
followed, with the video camera recording the chase, but the Pontiac soon outdistanced the
patrol car and disappeared around a corner.

 Nine days later, on December 21st, Officer Alvarez learned that appellant was going
to be at the Brazos Inn that evening. He, along with two other officers, staked out that
location. At about 10:30 p.m., they saw appellant enter the Inn; after a few minutes he left. 
Appellant got into the same Pontiac that Officer Alvarez had followed and videotaped nine
days earlier. Appellant turned onto Highway 6, traveling south. Officer Alvarez and two
other officers, all in separate patrol cars, came up behind appellant's car, turned on their
emergency lights, and attempted to pull him over. At first appellant slowed down, and pulled
over to the right, then he suddenly veered back left and accelerated to at least 95 to 100
m.p.h., leaving the three patrol cars far behind. The officers backed off for safety reasons
because they did not want to cause appellant to hit someone. They saw him cut across the
grassy median, make a U-turn and start back northbound, making both a northbound mini-van and another car stop in the middle of the highway to avoid a collision. Then, as the
patrol cars started to follow, appellant made yet another turn across the highway, through the
southbound lanes, and over a grassy embarkment. He pulled onto the frontage road, driving
the wrong way. When he came to the intersection, he maneuvered around at least one car
and then turned left on University Drive. Officer Alvarez said that the Pontiac was being
driven in such a reckless, careless, and aggressive manner that it was capable of causing
death or serious bodily injury. Another officer testified that at the speed appellant was
driving his "vehicle could become a missile, an object if one loses control; whether it's by
trying to exit [or] rear-end another vehicle at a high rate of speed."

 On December 24th, Christmas Eve afternoon, Ms. Tunnell reported to the police that
appellant was again following her in his mother's car. The dispatcher told her to come to the
College Station Police Department. Officer Wiesepape, who had been dispatched to
investigate, saw Ms. Tunnell's car as she started to pull into the police department parking
lot. Appellant's car was right behind her, but he did not pull into the parking lot. When
appellant looked into his rear view mirror and saw Officer Wiesepape driving behind him,
he cut across the traffic lanes and into the Taste of China parking lot. He stopped his car, but
when Officer Wiesepape also stopped, got out of his patrol car, and started toward the
Pontiac, appellant put the car into drive, jumped the curb, drove down a grassy embankment,
jumped the curb on the other side of the embankment, and landed back on the road. 
Appellant "blew" the stop sign without touching his brakes. The oncoming traffic had to 
stop suddenly. According to Officer Wiesepape, if those cars had not stopped, there would
have been an accident. Officer Wiesepape ran back to his car and drove off in pursuit
(although he did stop at the stop sign that appellant had run through because the traffic was
still blocked by the cars that had stopped for appellant) down Texas Avenue. Appellant had
disappeared once more.

 Officer Vick heard his fellow officer's "chase in progress" dispatch and saw
appellant's car pass by him, traveling at 70-80 m.p.h. in a 45 m.p.h. zone. Officer Vick
immediately put on his lights and siren, turned around and started to pursue appellant who
continued to accelerate. Appellant ran two more stop signs without braking, and, once again,
he disappeared. 

 Appellant was finally arrested on December 27th, when Ms. Tunnell, at the behest of
the police, set up a meeting with appellant at the Culpepper Plaza. Appellant had arrived
on a bike. When the police approached and ordered appellant to the ground, he jumped back
on his bike and rapidly rode off. The police finally surrounded him as he was riding down
a ditch. He told the officer who drove him to jail that if he had been in a car, they never
would have caught him. "Police are pussies and they can't catch shit."

 In a consolidated trial, a jury convicted appellant of stalking, aggravated assault by
threat, and the four evading arrest incidents. The jury also found that appellant had used his
mother's Pontiac Bonneville as a deadly weapon during three of the evading-arrest incidents.

 Appellant brought two points of error on appeal-legal and factual sufficiency to
support the four evading arrest convictions. He argued that the officers could not identify
him as the driver of his mother's car. The Waco Court of Appeals rejected these claims, but
reversed three of appellant's convictions based on what it called "fundamental charge error"
even though appellant had never raised such a claim either in the trial or appellate court. (5) It
stated that the trial court had "charged the jury at the guilt-innocence phase on the deadly
weapon issue by asking an extra question on the verdict form after the jury had determined
whether Olivas had evaded arrest using a vehicle." (6) The court concluded that (1) "the [trial]
court did not properly place the burden of proof regarding the deadly weapon issue on the
State"; (7) (2) "the charge did not require that the jury make the finding that Olivas used a
deadly weapon 'beyond a reasonable doubt'"; (8) (3) this error was "structural" and immune to
any harmless-error analysis; (9) (4) if the error was subject to a harmless-error analysis, it
caused appellant egregious harm under Almanza; (10) and (5) it was harmful constitutional error
under Tex. R. App. P. 44.2(a). (11) Chief Justice Gray dissented and stated: "There is no
fundamental error in the charge without egregious harm." (12)

II.


 The United States Supreme Court has held that a jury charge which misdefines the
State's burden of proof as being less than beyond a reasonable doubt constitutes structural
error. (13) It is never harmless-error. (14) "[A] constitutionally deficient reasonable doubt
instruction is a breed apart from the many other instructional errors that [the Supreme Court
has] held are amenable to harmless-error analysis." (15) However, as the Supreme Court has
recently reiterated, a jury instruction "that omits an element of the offense does not
necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for
determining guilt or innocence." (16) Thus, structural error goes to a complete mis-direction or
failure to instruct on the reasonable doubt standard, but a failure to instruct the jury on one
element of an offense or a failure to submit a sentencing issue to the jury under Apprendi (17)
is not structural error; it is subject to a harmless-error analysis. (18) If omitting an element
entirely from the jury charge is not structural error, it naturally follows that the failure to
instruct the jury on the State's burden of proof regarding one element of an offense (or on
a sentencing issue) is not structural error. (19)

 This Court uses the same rule as the Supreme Court regarding erroneous jury
instructions relating to reasonable doubt, except that Texas courts apply the specialized
harmless-error analysis set out in Almanza v. State for "partial" reasonable-doubt errors:

 if there is a total omission of the instruction on reasonable doubt, such error
defies meaningful analysis by harmless-error standards. However, if the jury
is given a partial or substantially correct charge on reasonable doubt, then any
error therein is subject to a harm analysis under Abdnor, Almanza, and Tex.
Code Crim. Proc. art. 36.19. (20)


 Under Almanza, a reviewing court uses different standards for analyzing jury-charge
errors depending upon whether the defendant did or did not object at trial. (21) "A party is not
excused from the procedural requirements for objecting at trial merely because an error
involves a constitutional right." (22) Thus, when jury-charge error is not raised at trial, an
appellate court may review that asserted (or, as in this case, unassigned) error, but a much
greater degree of harm is required for reversal when the error is not properly preserved. (23) To
be reversible, any unpreserved jury-charge error must result in "egregious harm" which
affects "the very basis of the case," deprives the defendant of a "valuable right," or "vitally
affect[s] a defensive theory." (24) 

 Under Almanza, reviewing courts should consider the following four factors:

 1) the charge itself;


 2) the state of the evidence including contested issues and the weight of the
probative evidence;


 3) arguments of counsel; and


 4) any other relevant information revealed by the record of the trial as a whole. (25)


We note that several unpublished court of appeals's opinions have used this Almanza analysis
when addressing whether this type of error relating to the deadly-weapon issue caused a
defendant egregious harm. (26)

III.


 In the present case, the "deadly weapon" issue did not explicitly incorporate the
required beyond-a-reasonable-doubt burden of proof. (27) The State concedes that this was
error, but contends that it was harmless-error under Almanza. Appellant and the court of
appeals contend that this error was "structural" under Sullivan and therefore immune to any
harmless-error analysis. 

 This was not structural error. The jury instructions did not totally omit any reference
to proof beyond a reasonable doubt, nor did those instructions mis-direct the jury concerning
that burden of proof. Instead, the instructions repeatedly told the jury that the State had the
burden to prove every element of the offense beyond a reasonable doubt. (28) These
instructions are not comparable to the misdirection on reasonable doubt found to be structural
error in Sullivan. Instead, the failure to explicitly set out the burden of proof in this deadly
weapon special issue is analogous to the failure in Recuenco to include a specific reference
to a "firearm" in the deadly weapon issue. (29) "Failure to submit a sentencing factor to the
jury, like failure to submit an element to the jury, is not structural error." (30) If the complete
failure to submit a deadly weapon issue to the jury is not structural error, then it ineluctably
follows that it is not structural error to submit a deadly weapon issue to the jury without an
explicit instruction that the State must prove that issue beyond a reasonable doubt. (31) 

 The court of appeals also held that, even if the error were not structural, it was
constitutionally harmful error under Tex. R. App. P. 44.2(a). (32) However, Rule 44.2(a) does
not apply to jury-charge error. The appropriate standard for all errors in the jury-charge,
statutory or constitutional, is that set out in Almanza. (33)

 Finally, the court of appeals held that the omission of an explicit beyond-a-reasonable-doubt instruction in the deadly weapon special issue was "fundamental" and "egregious"
error under Almanza. (34) Its Almanza analysis was, at best, succinct. It stated,

 An error results in egregious harm if it affects the very basis of the case,
deprives the defendant of a valuable right, or vitally affects a defensive theory.
The harm is determined by considering the entire charge; the state of the
evidence, including contested issues and the weight of the probative evidence;
the argument of counsel; and any other relevant information revealed by the
record as a whole. Considering all of those factors, we are left with the
conclusion that the court's judgment is based on a finding of the use of a
deadly weapon that was not made by the jury "beyond a reasonable doubt."
Thus, the error "affects the very basis of the case" and is "fundamental" and
"egregious." (35) 


We disagree. The court of appeals failed to analyze each Almanza factor, and its ultimate
conclusion is not supported by the record.

 First, one looks at the jury instructions as a whole. (36) Here, the State's beyond-a-reasonable-doubt burden of proof was repeated throughout the instructions. (37) There was no
mention of any other possible burden of proof. There was no mention that appellant might
have some burden of proof on any issue or fact. Although the deadly weapon issue itself did
not set out any explicit burden of proof, neither did the "guilty" or "not guilty" verdict
questions. (38) Thus, with both the "guilty" or "not guilty" verdict forms and the deadly weapon
issue, the jury was required to refer back to the general instructions. And those instructions
clearly told the jury that the State had the burden to prove, beyond a reasonable doubt, every
element of the offense. On the other hand, as appellant argues, the term "deadly weapon"
was never defined as an element of the offense, and the guilty verdict finding was separate
from the deadly-weapon finding, indicating that the use of a deadly weapon was not an
element of the evading arrest offense itself. Thus, it is possible, when viewing the written
jury instructions in isolation, that the jury might have thought that neither the State nor
appellant had any burden of proof on this question. Therefore, the first factor is not
determinative.

 Second, one looks to the state of the evidence and the contested issues. The primary
disputed issue at trial was appellant's identity as the driver of his mother's Pontiac
Bonneville, but the question of whether that car was used as a deadly weapon during the four
separate police chases was also contested. A conclusion that a car is a deadly weapon
"requires evidence that others were endangered, and not merely a hypothetical potential for
danger if others had been present." (39) Here, there is ample evidence that appellant's use of
his mother's car posed an actual danger of death or serious bodily injury to others during
three of those incidents:

1. The November 27th incident (No. PD-1933-04): Officer Agnew testified that, during
this chase, which started at the Tobacco Barn gas station, appellant swerved into the
oncoming lane of traffic as he sped around the corner from the gas station; he then
"just took off as fast as he could down MLK," going 50 m.p.h. in a 30 m.p.h. zone;
he overtook another vehicle, passing around it by driving in the oncoming traffic lane
and making those drivers slow down to avoid a collision; (40) in Officer Agnew's
opinion, the Pontiac was, during this time, capable of causing death or serious bodily
injury to the other motorists on the road.


2. The December 21st incident (No. PD-1935-04): Officer Alvarez testified that he and
two other officers, in three separate patrol cars, attempted to stop appellant who was
fleeing from them at speeds approaching 100 m.p.h. southbound on Highway 6; the
officers finally backed off because they didn't want him to hit another car at that
speed; when they slowed down, appellant did also, then he made a U-turn across the
median of the highway, causing two other cars to stop on the highway to avoid hitting
him; as the officers turned to chase him back northbound on Highway 6, appellant
once again drove across the grassy median, across the highway, over an embankment
separating the highway from the frontage road, and then drove against the traffic until
he got to University Drive where, after manuvering around another car, he
disappeared.


3. The December 24th incident (No. PD-1934-04): Officer Wiesepape testified that, after
appellant jumped the curb in the Taste of China parking lot, drove down a grassy
embankment, and jumped the curb in the opposite direction, he "blew" through the
stop sign and forced the oncoming traffic to suddenly stop to avoid an accident. The
traffic was still snarled up by the time Officer Wiesepape came to the stop sign in
pursuit of appellant. 


Appellant has not shown that the jury likely used some standard other than "beyond a
reasonable doubt" to have made its deadly weapon findings. The evidence is sufficient to
support such a finding beyond a reasonable doubt, however, it was not uncontested, and it
was not so conclusive as to make the second factor determinative.

 Third, one looks to the arguments of counsel. Both the State and defense told the jury
that the State was required to prove, beyond a reasonable doubt, that appellant used his car
as a deadly weapon. The defense argument was the more explicit concerning the State's
general burden of proof:

 "And what we're asking you do to is filter [the information] through that
standard that we talked about when we talked about in voir dire, 'beyond a
reasonable doubt.' 

 And remember how high a burden that was? Remember the levels that
we went through where we talked about the Terry stop and the reasonable
suspicion, and the probable cause, and getting up to preponderance of the
evidence, and then clear and convincing evidence?

 The standard that they would use to take away your children. And
understanding that the standard that the State has to meet in this particular case
is even higher than that. It is beyond a reasonable doubt.

 ...

 So when you go through here and you start to filter all this information
that has been presented to you, you have to use that as your guide: If the State
has met their burden. That's what we have asked you to do. That's what a
citizen has asked you to do; come in here as his peers." 


The defense was also more explicit in telling the jury that it must find the deadly weapon
issue beyond a reasonable doubt:

 "[A]s the State told you, you've got to go through-if you find that evading
arrest has occurred, and it is Raymond Olivas, then you've got to make a
decision about a deadly weapon. And you've got to go through the same
process. Beyond a reasonable doubt, that you believe in the manner of its use
of intended use, is capable of causing death or serious bodily injury." 

 

 "And that 'beyond a reasonable doubt' is individual to each one of you."


This factor shows that the jury was explicitly informed that it could not answer the deadly-weapon issue affirmatively unless it found that the State had carried its burden of proof of
"beyond a reasonable doubt." Although the express statement of law came from defense
counsel, not the trial judge's instructions, nothing in the instructions contradicted it, and no
one suggested that defense counsel's statement was incorrect or incomplete. 

 Fourth, one looks to any other relevant information. Here, the jury was obviously
capable of discriminating between the various evading incidents and the deadly weapon
findings because it found appellant guilty of evading arrest on December 12th, but also found
that he did not use a deadly weapon during that incident. (41) 

 In sum, it is hypothetically possible that the jury could have ignored defense counsel's
cogent explanation of the State's burden of proof as being "beyond a reasonable doubt" both
as to the elements of the offenses and as to the deadly weapon findings. There is, however,
nothing in this record that suggests that the jury did ignore this plain statement of the law or
that it failed to apply it correctly. Applying the individual Almanza factors to a review of this
record, we conclude that appellant has failed to show "egregious harm,"-that type and level
of harm which affects "the very basis of the case," deprived him of a "valuable right," or
"vitally affect[ed] a defensive theory." (42)

 We therefore reverse the judgment of the court of appeals and affirm the judgment of
the trial court.


Delivered: September 13, 2006

Publish
1. Olivas v. State, 153 S.W.3d 108, 118 (Tex. App.-Waco 2004).
2. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).
3. We granted three of the four issues raised by the State in its Petition for Discretionary
Review:

1. Did the Court of Appeals err in finding that the charge error was immune from harm
analysis?

2. Did the Court of Appeals incorrectly apply the egregious harm analysis of Almanza and
err in concluding that the error was egregious?

3. Did the Court of Appeals err in applying the harm analysis found under Tex. R. App. P.
44.2(a)?
4. Before calling Ms. Tunnell from Sloppy Joe's, appellant had called her from a phone
located at 5065 Enchanted Oaks Drive, appellant's mother's home. When Ms. Tunnell told the
police about this call, Officer Emig was dispatched out to the house. As he drove up, he saw a
car turn on its headlights in the driveway. Officer Emig parked his car in front of the driveway,
so the other car drove through the yard and over a culvert; then it sped off. Officer Emig turned
on his overhead lights and started to pursue what he then saw was a Pontiac Bonneville. 
Although he reached speeds close to 70 m.p.h., the officer could not catch up and soon lost the
Pontiac in the fog. About an hour later, Officer Emig received a dispatch that appellant had
called Ms. Tunnell yet again from the Wixon Valley Country Store, so the officer drove in that
direction. He saw a car that looked like the one he had pursued earlier in the evening coming
toward him right behind a slow-moving truck. Officer Emig turned around to follow, but the
Bonneville passed the truck in a no-pass zone and once more sped off. 
5. Olivas, 153 S.W.3d at 113.
6. Id. at 114-15. The special issue was set out on the one-page verdict form, immediately
below the "guilty" verdict form. It read:


 Answer the Deadly Weapon Question only if you have found the defendant guilty. 
Otherwise do not answer the Deadly Weapon Question.


DEADLY WEAPON



 WE, THE JURY, find the defendant, RAYMOND OLIVAS, did use a deadly
weapon during the commission of the offense alleged in the indictment.


 _____________________

 PRESIDING JUROR


 WE, THE JURY, find the defendant, RAYMOND OLIVAS, did not use a deadly
weapon during the commission of the offense alleged in the indictment.


 _____________________

 PRESIDING JUROR
7. Id. at 115.
8. Id. 
9. Id. at 117. The court of appeals also held that the deadly weapon issue was improperly
submitted during the guilt stage of the trial. Id. at 116-17. That issue is not before us, but we
note that the deadly weapon issue has been submitted in this manner in other cases. See
Goodrich v. State, 156 S.W.3d 141, 148 (Tex. App.-Dallas 2005, pet. ref'd) (stating that "in this
case, at the guilt phase, the jury found appellant used or exhibited a deadly weapon; thus, under
section 12.35(c)(1), the punishment range for the offense was that of a third degree felony");
Burton v. State, 136 S.W.3d 355, 362 (Tex. App.-Austin 2004, pet. ref'd) (stating, "At the
guilt/innocence stage of the trial, the trial court submitted to the jury the state jail felony offense .
. . and a special issue as to whether appellant used a deadly weapon, a motor vehicle, in the
commission of the offense"). 
10. Id. at 117 (citing Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).
11. Id. at 117-18.
12. Id. at 118.
13. Sullivan v. Louisiana, 508 U.S. 275, 281-82 (1993) (jury instruction was "essentially
identical" to that disapproved in Cage v. Louisiana, 498 U.S. 39 (1990) (per curiam)). The
instruction in Cage equated "a reasonable doubt with a 'grave uncertainty' and an 'actual
substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant
was guilty." 498 U.S. at 41. The Supreme Court held that the instruction suggested "a higher
degree of doubt than is required for acquittal under the reasonable-doubt standard" and that "a
reasonable juror could have interpreted the instruction to allow a finding of guilt based on a
degree of proof below that required by the Due Process Clause." Id. See also Sullivan, 508 U.S.
at 280 (stating that, if there is "no jury verdict of guilty-beyond-a-reasonable-doubt, the question
whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent
the constitutional error is utterly meaningless. There is no object, so to speak, upon which
harmless-error scrutiny can operate").
14. Id. 
15. Id. at 284 (Rehnquist, C.J., concurring) (emphasis in original).
16. Washington v. Recuenco, No. 05-83, 126 S.Ct. 2546, 2552 (June 26, 2006) (quoting
Neder v. United States, 527 U.S. 1, 9 (1999)). In Recuenco, the defendant was charged with
assault with a deadly weapon, to-wit: a handgun. The jury found the defendant guilty and
answered the special deadly weapon issue in the affirmative. It did not, however, specifically
find that the deadly weapon used was a "firearm" which, under Washington law, calls for a
mandatory three-year enhancement. Id. at 2549. The Supreme Court held that the prosecution's
failure to prove the sentencing factor of "armed with a firearm" to the jury beyond a reasonable
doubt was subject to harmless-error analysis. Id. at 2553. Similarly, in Neder, the Supreme
Court held that the failure to submit the element of the "materiality" of a false statement in the
jury instructions in a trial for mail fraud, wire fraud, and bank fraud was subject to a harmless-error analysis. Neder, 527 U.S. at 9.
17. Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (holding, "Other than the fact of a
prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable doubt").
18. See United States v. Vazquez, 271 F.3d 93, 98-103 (3d Cir. 2001) (en banc) (collecting
cases from the First, Fifth, Seventh, Eighth, Tenth, Eleventh and District of Columbia Circuits
and holding that unobjected-to Apprendi error in failing to submit an enhancement issue to the
jury was subject to "plain error" harmless-error review; rejecting defendant's argument that an
Apprendi violation is a structural defect); State v. Gordon, 663 N.W.2d 765, 776-77 (Wis. 2003)
(collecting cases and stating, "Neder's harmless-error analysis has been applied to Apprendi-type
errors in every single federal appellate circuit. In addition, several state appellate courts have
also applied Neder to Apprendi-type errors") (footnotes omitted).
19. See Recuenco, 126 S.Ct. at 2553.
20. Toney v. State, 979 S.W.2d 642, 644-45 (Tex. Crim. App. 1998); see also Mann v.
State, 964 S.W.2d 639, 642 (Tex. Crim. App. 1998) (plurality op.) (holding that "where an error
in the jury charge on reasonable doubt or burden of proof is isolated to one portion thereof and
the remainder of the jury charge contains language negating the erroneous portion thereof, the
effect of the error is analyzed by employment of the standards set forth by this Court in Abdnor
and Almanza, and which are based on Article 36.19").
21. Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex. Crim. App. 1994). This Court
explained:

 The standard to determine whether sufficient harm resulted from the charging
error to require reversal depends upon whether appellant objected. Where there
has been a timely objection made at trial, an appellate court will search for only
"some harm." By contrast, where the error is urged for the first time on appeal, a
reviewing court will search for "egregious harm."

Id. at 731-32.
22. Jimenez v. State, 32 S.W.3d 233, 235 (Tex. Crim. App. 2000).
23. Almanza, 686 S.W.2d at 171; see also Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim.
App. 1996).
24. Almanza, 686 S.W.2d at 172; Hutch, 922 S.W.2d at 171.
25. Hutch, 922 S.W.2d at 171 (citations omitted).
26. See Villanueva v. State, No. 01-04-01070-CR, 2006 Tex. App. LEXIS 4957 *12-13
(Tex. App.-Houston [1st Dist.] 2006, n.p.h.) (rejecting defendant's contention that the failure to
instruct the jury that the State had the burden to define "deadly weapon" and prove the deadly
weapon issue beyond a reasonable doubt was "structural error" under Sullivan v. Louisiana;
applying Almanza analysis and concluding that the defendant had failed to prove egregious
harm); Delgadillo v. State, No. 08-01-00455-CR, 2004 Tex. App. LEXIS 5455 *29-31 (Tex.
App.-El Paso 2004, pet. ref'd) (applying Almanza analysis to trial court's error in failing to
include a "beyond a reasonable doubt" instruction as to the deadly weapon finding; concluding,
"While the jury was not specifically instructed on the State's burden with respect to the deadly
weapon issue, it was properly instructed on the State's burden of proof of beyond a reasonable
doubt in the guilt-innocence phase of the trial and no other burden of proof was provided to the
jury. Appellant has failed to show egregious harm resulted from the complained-of charge
error"); see also Hooker v. State, No. 12-02-00173-CR, 2003 Tex. App. LEXIS 7668 *7-11 (Tex.
App.-Tyler 2003, pet. ref'd) (applying Almanza analysis to unobjected-to jury-charge error in
deadly weapon issue asking whether defendant "used or exhibited" a vehicle during commission
of evading arrest offense and finding no "egregious harm").
27. It could have been easily corrected by adding the phrase "beyond a reasonable doubt" to
both inquiries, such that they would read:


 WE, THE JURY, find beyond a reasonable doubt that the defendant, RAYMOND
OLIVAS, used a deadly weapon during the commission of the offense alleged in
the indictment.


 WE, THE JURY, do not find beyond a reasonable doubt that the defendant,
RAYMOND OLIVAS, used a deadly weapon during the commission of the
offense alleged in the indictment.
28. The instructions stated that "no person may be convicted of an offense unless each
element of the offense is proved beyond a reasonable doubt"; "In case you have a reasonable
doubt as to the defendant's guilt after considering all the evidence before you, and these
instructions, you will acquit him"; "In determining the guilt or innocence of the defendant, you
shall not discuss or consider the punishment, if any, which may be assessed against the defendant
in the event he is found guilty beyond a reasonable doubt." Furthermore, the application
paragraphs of the jury-charge repeated the correct beyond-a-reasonable-doubt burden of proof
three times.
29. 126 S.Ct. at 2553.
30. Id.
31. It is, however, understandable that both appellant and the court of appeals might think
otherwise because Recuenco did not definitively resolve this question until after the court of
appeals had issued its opinion and appellant had filed his Brief in this Court. 
32. Olivas, 153 S.W.3d at 118.
33. Ex parte Smith, 185 S.W.3d 455, 467 (Tex. Crim. App. 2006); Jimenez v. State, 32
S.W.3d at 235, 238.
34. Olivas, 153 S.W.3d at 117.
35. Id. (citations omitted).
36. See Boyde v. California, 494 U.S. 370, 378 (1990) (repeating "the well-established
proposition that a single instruction to a jury may not be judged in artificial isolation, but must be
viewed in the context of the overall charge"); see also Johnson v. Texas, 509 U.S. 350, 368
(1993) ("In evaluating the instructions, [a court should] not engage in a technical parsing of this
language of the instructions, but instead approach the instructions in the same way that the jury
would-with a 'commonsense understanding of the instructions in the light of all that has taken
place at the trial'"). 
37. Appellant argues that 

 [t]he burden of proof was mentioned five (5) times in the charge. Four (4) of
those times it related to the "elements," or the "guilt" of the Respondent. Since a
deadly weapon related to neither of those two issues, the charge was deficient in
this regard. The only other mention of the burden of proof was one (1) statement
that the burden of proof rests upon the state throughout the trial. However, this
one statement was not specific to the special issue and was outweighed by the
inferences created by the other four (4) references to the state's burden on the
elements and guilt of the Respondent.

Appellant's Brief at 17.
38. The guilt-stage verdict questions were:

 WE, THE JURY, find the defendant, RAYMOND OLIVAS, guilty of the offense
of Evading Arrest with a vehicle as charged in the indictment.


 WE, THE JURY, find the defendant, RAYMOND OLIVAS, not guilty.
39. [Edwin Harris] Mann v. State, 13 S.W.3d 89, 92 (Tex. App.-Austin 2000), aff'd, 58
S.W.3d 132, (Tex. Crim. App. 2001). In affirming the court of appeals's decision in Mann, we
stated, "We have reviewed that part of the Court of Appeals' opinion dealing with the merits of
appellant's deadly weapon claim and find it to be sound. We therefore adopt that part of the
opinion as our own without further comment." 58 S.W.3d at 132. See Drichas v. State, 175
S.W.3d 795, 798 (Tex. Crim. App. 2005) (finding legally sufficient evidence that car was used as
a deadly weapon in prosecution for evading arrest because "[a]ppellant's manner of using . . . his
truck posed a danger to pursuing officers and other motorists that was more than simply
hypothetical; the danger was real, and the manner in which appellant drove his truck made it
capable of causing death or serious bodily injury, particularly where appellant drove on the
wrong side of the highway").
40. Appellant argues that there is "only hypothetical evidence" suggesting that the driver of
an oncoming vehicle who slowed down and pulled to the right to avoid appellant's car was in
danger. There was, according to appellant, no actual danger because that driver avoided a
collision. Avoidance of a collision does not, however, negate the existence of actual danger;
instead, it shows a quick reaction in the face of actual danger.
41. Indeed, the State had explicitly told the jury, during its closing argument, "Now, when
you decide these evading charges, you can find the defendant guilty of evading and not believe he
used or exhibited a deadly weapon. You don't have to find both in order to find the defendant
guilty." The jury did exactly that.
42. Almanza, 686 S.W.2d at 172.