

**NUMBER 13-07-567-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI ‑ EDINBURG**

---

**MELVIN CARTER,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 319th District Court
of Nueces County, Texas**

---

## MEMORANDUM OPINION

**Before Justices Yañez, Garza, and Vela
Memorandum Opinion by Justice Vela**

Appellant, Melvin Carter, was indicted for burglary of a habitation[1] and retaliation.[2]

The indictment named Erica Jones as the victim of both offenses. The jury acquitted

---

[1]*See* TEX. PENAL CODE ANN. § 30.02 (Vernon 2003).

[2]*See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A), (B) (Vernon Supp. 2008). Retaliation is a third-degree felony. *Id*. § 36.06(c).

Carter of the burglary charge, but convicted him of retaliation. After finding Carter had two prior felony convictions, the trial court sentenced him to fifty years' imprisonment. By three issues, Carter complains that 1) the charge was fundamentally defective, 2) the evidence was legally and factually insufficient to support the conviction, and 3) he was prejudiced by the prosecutor's comments before the jury. We affirm.

## I. Background

On March 25, 2007, Corpus Christi Police Officer Ruben Flores responded to a disturbance call at an apartment in the Northside Manor Apartments. At the scene, he met Erica Jones, the person who placed the call. The front door to Jones's apartment had been kicked in, and Jones had "some bruising" to her right eye and a bruise on her left arm. She told Officer Flores that her sister's boyfriend, Melvin Carter, had assaulted her.

On April 1, 2007, Officer Flores was again dispatched to Jones's apartment. Jones told Officer Flores that she was "in fear for her life" and that "throughout the night she received threatening phone calls from Melvin Carter." She recorded these calls on her cell phone's voicemail and played them for Officer Flores. He described the tenor of the calls as "[v]ery threatening" and testified that when she played the messages for him, she was "upset and frightened all at the same time." With respect to these calls, the State's attorney asked Officer Flores:

> Q. Based on your experience and training, did you feel that he [Melvin Carter] was threatening to kill Erica Jones?
>
> A. Yes.
>
> Q. Based on your experience and training, did you believe that he was threatening to harm her?
>
> A. Yes.
>
> Q. And based on your experience and training, and the content of the

tape, did you believe that he was threatening to harm her on account of her being a witness against him or reporting a crime against him?

A.     Yes.

Jones testified that on the night of March 25, 2007, Carter knocked on her door at approximately 11:45 to 11:55 p.m. and asked for his "stuff" and his phone. As Carter continued to bang on the door, Jones stated that she was going to call the police. Carter then kicked in the door and began searching every room in the apartment. When Carter saw Raquel Holt,[3] his ex-girlfriend and Jones's sister, he tried to attack her, but Jones got between the two and was hit by Carter. Carter then pulled Jones's arm and threw her on the bed. Carter took $36 from Jones and got his cell phone. When Jones told Carter she was going to call the police, Carter left the apartment. After he left, she called the police.

When the State's attorney asked Jones if she had any contact with Carter after the incident, she said that she had seen him at a pool hall and that he "just started calling. He was threatening my—threatening to kill my kids." When the State's attorney asked her, "Was he threatening you also?", she replied, "Yes." At this point, the State's attorney asked her:

Q.     How did he threaten you?

A.     That he was going to have my kids taken away from me, and that every time I step outside that a bitch was going to beat my ass.

Q.     Did you—were you afraid of these threats?

A.     Yes.

Q.     Did you think they were threats to kill you or hurt you?

A.     Yes.

---

[3]Raquel Holt did not testify.

3

She testified that one of Carter's messages stated that "Me [Jones] and my sister [Raquel Holt] will be torn up by bitches every time we step outside the house."[4] She interpreted the phrase "torn up" to mean "I guess get our butts kicked." Another message from Carter addressed to Jones's sister, contained the following statement: "I've got seven kids. Well, since you don't give a damn about that, you know what, I'll take hers from her. And I'm tired of taking life. Since she wanted to get me locked up for life, I'm going' take that bitch's kid's life. I'm going to take her kids and put them in the ground." In the next phone message, Carter stated: "So, if I got to go do 25 to life for sure, just believe me that bitch is going to do 25 years of suffering. Tough shit." In his final phone message, Carter addressed Jones by name, stating: "Hey Erica, fuckin' bitch. Said you gonna call the law on me, fuckin' bitch."

When the State's attorney asked Jones if she "consider[ed] those calls to be a threatening and unlawful act against you?", she replied, "Yes." She answered "Yes" when the State's attorney asked her, "And did you think they were threatening to kill you and/or your kids?"

Officer Edward Alvarado heard a recording of the calls that Carter made to Jones. When the State's attorney asked Officer Alvarado, "And based on your experience and training, did they appear to be threatening her life and also in connection with her being a prospective witness or a witness or a person who filed charges against the defendant?", he replied, "Yes." Officer Alvarado testified that Jones identified Carter as the person who made the threatening phone calls.

---

[4]This is a reference to a call which stated, in relevant part, "Every time you keep steppin' out the house that bitch going to tear your ass up. You and your sisters put those punk-ass charges on me. . . . You all [unintelligible] going to get your ass tore up every time I step out the house."

*Appellant's Evidence*

Appellant's mother, Ella Carter, testified that in February or March 2007, appellant was living with Erica Jones and Raquel Holt. Ella said that in February 2007, Holt was in jail and asked her to call Jones. When Ella called Jones, Jones told her that she was "going to do something bad about" appellant because of something he had done. Ella also stated that Jones had called her and made a threat against appellant. Ella testified that she had never seen her son follow through with any threats that he has made. She testified that "I feel like anybody can get mad and say things that they don't mean."

On cross-examination, when the State's attorney asked Ella, "Isn't it a fact, after hearing that tape, Melvin Carter was pretty darn angry at Erica Jones for bringing these charges against him, wasn't he?", she replied, "Yeah, he was."

Shamair Carter, appellant's sister, testified that "[a]bout late February, March" 2007, appellant was living at Northside Manor Apartments. She also testified that "around midnight" on March 25, 2007, she saw appellant at a nightclub. He did not mention anything about being at Jones's apartment that night. However, appellant did tell Shamair that he "wanted to get some stuff from" Jones.

On cross-examination, Shamir testified that Jones "was trying to frame" appellant and "trying to put these charges on him because her door was broken into."

Julie Pinon testified that she used to live across from Erica Jones. She said that around 10:15 p.m. on March 25, 2007, appellant knocked on Jones's door and asked Jones for his cell phone. She said that Jones told him, "'We don't have your f------ cell phone.'" She said that after Jones told this to appellant, he left. About thirty minutes later, another man came to Jones's apartment. Pinon testified she heard this man "banging" and he "kicked the door in, and all I heard was him run out."

5

Appellant did not testify during the guilt-innocence stage.

## II. Charge Error

By issue one, Carter argues that the charge is fundamentally defective because it did not require the jury to find that he intended to inhibit Jones's service as a witness, prospective witness, or person who had reported a crime, or that he knew that his threat was reasonably certain to inhibit such service.

When evaluating an allegation of charge error, we first determine whether there was error in the charge. *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g) (holding that finding error in the charge begins—not ends—the inquiry); *see also Ex parte Smith*, 185 S.W.3d 455, 464 (Tex. Crim. App. 2006). If so, "the next step is to make an evidentiary review . . . as well as a review of any other part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *Almanza*, 686 S.W.2d at 174 (op. on reh'g).

*A. The Offense of Retaliation*

Section 36.06 of the penal code provides that a person can commit the offense of "Obstruction or Retaliation" in either of two ways:

(a) A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1) in retaliation for or on account of the service or status of another as a:

(A) public servant, witness, prospective witness, or informant; or

(B) person who has reported or who the actor knows intends to report the occurrence of a crime; *or*

(2) to prevent or delay the service of another as a:

(A) public servant, witness, prospective witness, or informant;

6

or

> (B) person who has reported or who the actor knows intends to report the occurrence of a crime.

TEX. PENAL CODE ANN. § 36.06 (Vernon Supp. 2008) (emphasis added).  Subsection (a)(1) prohibits harming or threatening to harm another *in retaliation for* his service, *Ortiz v. State*, 93 S.W.3d 79, 87 (Tex. Crim. App. 2002) (emphasis added), and subsection (a)(2) prohibits harming or threatening to harm another *to prevent or delay* his service.  *Id.* (emphasis added).

In this case, the application portion of the charge provided, in relevant part, that the jury could convict Carter of retaliation if he intentionally or knowingly "threaten[ed] to harm another, to-wit:  ERICA JONES, by an unlawful act, to-wit:  threatening to kill ERICA JONES, in retaliation for or on account of ERICA JONES as a witness or a prospective witness or a person who has reported the occurrence of a crime, . . . ."  Thus, the court charged the jury under section 36.06(a)(1)(A) and (B).  *See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A), (B) (Vernon Supp. 2008).  Accordingly, the State was not required to prove that Carter threatened to harm Jones to either "prevent or delay," or inhibit her service.

*B. Culpable Mental State*

By this same issue, Carter argues the offense of retaliation is a result-oriented crime and that the focus is not on whether a threatening statement was made; rather, the focus is on whether the statement was made with intent to inhibit the alleged victim's services as a witness, prospective witness, or person who had reported a crime, or with knowledge that it was reasonably certain to inhibit such service.

The court of criminal appeals has recognized that section 6.03 of the penal code delineates three "conduct elements" that may be involved in an offense:  (1) the nature of

7

the conduct; (2) the result of the conduct; and (3) the circumstances surrounding the conduct. *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989); *see* TEX. PENAL CODE ANN. § 6.03(a), (b) (Vernon 2003). An offense may contain any one or more of these "conduct elements" that alone, or in combination form, the overall behavior that our legislature has intended to criminalize, and it is those essential "conduct elements" to which a culpable mental state must apply. *McQueen*, 781 S.W.2d at 603.

A charge that defines intentionally or knowingly as those terms relate to the nature of the conduct at issue is error when the offense charged is a result-oriented offense. *Herrera v. State*, 915 S.W.2d 94, 98 (Tex. App.–San Antonio 1996, no pet.). In *Herrera,* the appellate court, after examining section 36.06(a)(2) of the penal code, concluded that: "[O]bstruction is in fact a result oriented offense," and "[t]he focus is on whether the conduct is done with the intent to effect the result specified in the statute." *Id*. at 98, *see In re B.P.H.*, 83 S.W.3d 400, 407 (Tex. App.–Fort Worth 2002, no pet.) (under penal code section 36.06(a)(1)(A), retaliation is a result-oriented offense and focus is on whether conduct is done with intent to effect result specified in statute).

We have stated that when an offense is only a "result" or a "nature of the conduct" type of offense, the trial court should submit statutory definitions of "intentionally" or "knowingly" that are limited to the respective culpable mental states required.[5] *Saldivar v. State*, 783 S.W.2d 265, 268 (Tex. App.–Corpus Christi 1989, no pet.). Here, the jury was

---

[5]Similarly, when an offense is *both* a result-and a nature-oriented offense, with respect to the intent or the knowledge required, the trial court should submit complete statutory definitions of "intentional" and "knowingly" so the jury can consider both the result of the offender's conduct and the nature of his or her conduct. *Saldivar v. State*, 783 S.W.2d 265, 267-68 (Tex. App.–Corpus Christi 1989, no pet.). When an offense is not clearly categorized with respect to the conduct elements required, the trial court may submit the full statutory definitions of "intentionally" and "knowingly" because both definitions allow the jury to consider the nature of the offender's conduct or the results of his conduct. *Baker v. State*, 94 S.W.2d 684 (Tex. App.–Eastland 2002, no pet.); *Murray v. State*, 804 S.W.2d 278, 281 (Tex. App.–Fort Worth 1991, pet. ref'd).

allowed to find Carter guilty if it found he possessed the mens rea with respect to any of the three conduct elements.[6] *See* TEX. PENAL CODE ANN. § 6.03(a), (b) (Vernon 2003). Therefore, the trial court erred because it did not limit the statutory definitions of "intentionally" or "knowingly" to the respective culpable mental state required for a result-oriented offense. *See Cook v. State,* 884 S.W.2d 485, 491 (Tex. Crim. App. 1994) ("It is error for a trial judge to not limit the definitions of the culpable mental states as they relate to the conduct elements involved in the particular offense.").

*C. Harm Analysis*

When, as in this case, an accused fails to object to the charge, "he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza*, 686 S.W.2d at 171. The error must "'go to the very basis of the case,'" "deprive the accused of a 'valuable right,'" or "'vitally affect his defensive theory.'" *Id*. at 172. The degree of harm, sufficiently serious to be called "egregious," is present whenever a reviewing court finds the case for conviction or punishment was actually made clearly and significantly more persuasive by the error. *Saunders v. State,* 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State,* 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). The actual degree of harm is assayed

---

[6]The charge defined "intentionally" and "knowingly" as follows:

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exists [sic]. A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171.

*1. The Charge*

Paragraph five of the charge correctly defined the offense of retaliation.[7] *See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A), (B) (Vernon Supp. 2008). The application paragraph properly instructed the jury that it was required to find beyond a reasonable doubt that Carter intentionally or knowingly threatened to harm Jones by threatening to kill her in retaliation for or on account of her status as a witness, or a prospective witness, or a person who has reported the occurrence of a crime. *See id*. "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (even when State conceded trial court erred in defining knowingly with respect to nature of conduct and not to result of conduct, no egregious harm when application paragraph correctly instructs the jury).

Furthermore, "[a] central purpose of the [retaliation] statute is to encourage a certain class of citizens to perform vital public duties without fear of retribution." *Doyle v. State*, 661 S.W.2d 726, 729 (Tex. Crim. App. 1983) (per curiam). "Those public duties may include reporting criminal activities, testifying in official proceedings, or cooperating with the government in a criminal investigation." *Morrow v. State*, 862 S.W.2d 612, 615 (Tex. Crim. App. 1993). "Section 36.06 [of the penal code] seeks to encourage such participation

---

[7]Paragraph five instructed the jury:

> A person commits the offense of retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act; in retaliation for or on account of the service or status of another as a public servant, witness, or prospective witness, or a person who has reported or who the defendant knows intends to report the occurrence of a crime.

*See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A) (Vernon Supp. 2008).

10

without fear of retribution." *Id*. In this case, the application paragraph alleged that Carter threatened to kill Jones in retaliation for or on account of her status as a witness, or a prospective witness, or a person who has reported the occurrence of a crime. Accordingly, the jury's focus was properly directed to the result of Carter's conduct and not to the conduct itself.

### 2. State of the Evidence and Contested Issues

Jones testified that Carter assaulted her, kicked in her door, and entered her apartment. He left when she told him she was going to call the police. After she reported this to the police, Carter threatened to kill her. This evidence satisfied the requirements of section 36.06(a)(1)(A) and (B). Furthermore, while the issue of whether Carter acted intentionally or knowingly was part of the State's required proof, this was not a contested issue and consequently Carter could not be egregiously harmed by the definitions of the intentional and knowing state of mind. *See Saldivar*, 783 S.W.2d at 268 ("Where no defense is presented which would directly affect an assessment of mental culpability, there is no harm in submitting erroneous definitions of 'intentionally' and 'knowingly.'").

### 3. Arguments of Counsel

During the State's closing argument at the guilt-innocence stage, the prosecutor did not tell the jury that in order to convict Carter of retaliation, it needed to find he intended to inhibit Jones's service as a witness, prospective witness, or person who had reported a crime, or that he knew that his threat was reasonably certain to inhibit such service.

### 4. Other Relevant Information

Carter's defensive strategy was to undermine Jones's credibility by adducing evidence that she had planned to do something bad to him and that she was lying about him kicking in her door and assaulting her. The jury obviously resolved the credibility issue

11

in Jones's favor.

We conclude that the charge error did not affect the very basis of the case, deprive Carter of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *See Saunders,* 817 S.W.2d at 692; *Almanza*, 686 S.W.2d at 172. We hold, therefore, that the charge as submitted did not result in egregious harm to Carter. Issue one is overruled.

### III. Sufficiency of the Evidence

In issue two, Carter challenges the legal and factual sufficiency of the evidence to support the conviction. In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hampton v. State*, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The trier of fact is the sole judge of the weight and credibility of the evidence. TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In reviewing a factual sufficiency claim, we review the evidence in a neutral light rather than the light most favorable to the verdict. *Neal v. State*, 256 S.W.3d 264, 275

12

(Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000)). Evidence is factually insufficient if the evidence supporting the verdict is so weak that the verdict seems clearly wrong and manifestly unjust, or if the supporting evidence is outweighed by the great weight and preponderance of the contrary evidence so as to render the verdict clearly wrong and manifestly unjust. *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). We do not reverse for factual insufficiency if the greater weight and preponderance of the evidence actually favors conviction. *Neal*, 256 S.W.3d at 275; *Roberts*, 220 S.W.3d at 524 (citing *Watson*, 204 S.W.3d at 417).

A person commits the offense of retaliation if he (1) intentionally or knowingly (2) harms or threatens to harm another by an unlawful act (3) in retaliation for or on account of the service or status of another (4) as either a public servant, witness, prospective witness or informant, or as a person who has reported or who the actor knows intends to report the occurrence of a crime. TEX. PENAL CODE ANN. § 36.06(a)(1)(A), (B) (Vernon Supp. 2008); *Stewart v. State*, 137 S.W.3d 184, 188 (Tex. App.–Houston [1st Dist.] 2004, pet. ref'd).

Retaliatory intent may be inferred from the accused's acts, words, or conduct. *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982). The statute does not require that an accused intend to carry out the threat, take any affirmative steps to carry out the threat, or communicate the threat directly to the witness. *Lebleu v. State*, 192 S.W.3d 205, 209, 211 (Tex. App.–Houston [14th Dist.] 2006, pet. ref'd); *see Doyle*, 661 S.W.2d at 728. Furthermore, the statute does not require that the threatened retaliatory harm be imminent. *In re B.P.H.*, 83 S.W.3d at 407; *In re B.M.*, 1 S.W.3d 204, 207 (Tex. App.–Tyler 1999, no

13

pet.); *Coward v. State*, 931 S.W.2d 386, 389 (Tex. App.–Houston [14th Dist.] 1996, no pet.); *Puckett v. State*, 801 S.W.2d 188, 194 (Tex. App.–Houston [14th Dist.] 1990, pet. ref'd).

As alleged in the application paragraph, the State had to prove that Jones was a "witness or a prospective witness or a person who has reported the occurrence of a crime." *See* TEX. PENAL CODE ANN. § 36.06(a)(1)(A), (B) (Vernon Supp. 2008).

A "prospective witness" is one who may testify in an official proceeding. *Morrow*, 862 S.W.2d at 614. A person who witnesses an offense, but who has not yet testified in a trial involving that offense, is also a prospective witness. *Solomon v. State*, 830 S.W.2d 636, 637 (Tex. App.–Texarkana 1992, pet. ref'd). Whether a person is a prospective witness must be judged from the standpoint of the one who retaliates. *Id*. However, an official proceeding need not be initiated in order for a person to be a prospective witness. *Morrow,* 862 S.W.2d at 615. For example, when a witness to an auto accident gives his or her account of the accident to the police for use in the police report, that person becomes a prospective witness. *Rudolph v. State*, 70 S.W.3d 177, 179 (Tex. App.–San Antonio 2001, no pet.)

In this case, a rational jury could have determined the following from the evidence: (1) Melvin Carter assaulted Jones; (2) when Jones told Carter she was going to call the police, he left the apartment; (3) after Carter left the apartment, Jones called the police; (4) Jones told Officer Flores that Carter assaulted Jones and kicked in her door; (5) after Jones reported the incident to the police, Jones received threatening phone calls from Carter and told Officer Flores she was "in fear for her life;" (6) Jones thought they were threats to kill her or hurt her; (7) in one of these calls, Carter told Jones: "Hey Erica, [expletive deleted]. Said you gonna call the law on me, [expletive deleted];" and (8) Officer

14

Flores heard these calls and testified he felt that Carter was threatening to kill Jones, and he believed Carter was threatening to harm her on account of her being a witness against Carter or reporting a crime against him.

Carter provided controverting evidence showing that: (1) at the time of the incident, he and his sister were at a nightclub; (2) Carter was not the man that kicked in Jones's door; (3) prior to the incident, Jones told Carter's mother that she was going to do something bad to Carter; and (4) shortly after the incident, Jones saw Carter at a pool hall and that nothing happened between them.

When viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have accepted the State's evidence as true and inferred from Carter's acts, words, and conduct that he intentionally or knowingly threatened to harm Jones by an unlawful act, that is, he threatened to kill her in retaliation for or on account of her status as a prospective witness or a person who had reported the occurrence of a crime—Carter's assault against Jones. Thus, the evidence is legally sufficient to support Carter's retaliation conviction beyond a reasonable doubt. *See Rudolph*, 70 S.W.3d at 179 (holding that a defendant's threatening phone calls to auto-accident witness were retaliation).

Viewing the same evidence in a neutral light, we conclude the evidence was not so weak that the jury's determination was clearly wrong and manifestly unjust, or that the conflicting evidence presented by Carter so greatly outweighed the evidence supporting the conviction that the jury's determination was manifestly unjust. *See Watson,* 204 S.W.3d at 414-15, 417; *Johnson,* 23 S.W.3d at 11. *See Rudolph,* 70 S.W.3d at 178 (holding accused's threatening phone calls to auto accident witness was retaliation); *Webb v. State*, 991 S.W.2d 408, 417 (Tex. App.–Houston [14th Dist.] 1999, pet. ref'd) (holding that an accused's threat to a woman who intended to report him to CPS was retaliation).

15

Furthermore, a reasonable trier of fact could infer from Jones's testimony that Carter thought Jones could report what he had done and testify against him. *See Webb*, 991 S.W.2d at 417 (holding that a victim was prospective witness when an accused's threats demonstrated that he knew victim intended to report a crime that he committed). Therefore, we conclude the evidence was factually sufficient to support the conviction. Issue two is overruled.

IV. Prosecutorial Misconduct

In issue three, Carter asserts that he was prejudiced by the prosecutor's comments before the jury. During the guilt-innocence stage, appellant's sister, Shamair Carter, testified she and appellant were at a nightclub at the time Jones claimed appellant kicked in her door and assaulted her. On cross-examination, the State's attorney questioned her about why she did not provide this information to the grand jury. The State's attorney asked her:

> Q. Melvin Carter was indicted by the grand jury on this case—I can't see the date exactly but it looks like April. Did you ever go down to the grand jury and tell them, "Hey, don't indict my brother for burglary. He was with me that night"?
>
> A. I was unaware.
>
> Q. Tell me that again. You were unaware that your brother was charged with this?
>
> A. I was unaware of things that I could have done. . . .
>
> * * *
>
> Now that you're telling me all of this, I wish that I would have. Now that I know that I—what I can do, if ever—if ever I need to for next time, now I know all those names—I
>
> Q. The next time you have to provide an alibi for your brother?
>
> A. No. For anything. If anybody is being accused or, you know, for any

16

type of situation. If anybody is being falsely accused, that I'm aware of, now I know of the people that I can contact.

*Applicable Law & Analysis*

An appellate court reviews allegations of prosecutorial misconduct on a case-by-case basis. *Stahl v. State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988). The review is not limited to only the facts of each case, but also the probable effect on the jurors' minds. *Hodge v. State*, 488 S.W.2d 779, 781-82 (Tex. Crim. App. 1973). Courts have held a prosecutor's conduct inappropriate when his or her actions deliberately violate an express court order, and when misconduct is "so blatant as to border on being contumacious." *Stahl*, 749 S.W.2d at 831. To trigger reversal, the question must be obviously harmful to the defendant. *Ransom v. State*, 789 S.W.2d 572, 585 (Tex. Crim. App. 1989); *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex. Crim. App. 1985) (appellate courts rarely reverse a conviction due to an improper prosecutorial question). Additionally, it must be of "such a character so as to suggest the impermissibility of withdrawing the impression produced." *Huffman v. State*, 746 S.W.2d 212, 218 (Tex. Crim. App. 1988).

To preserve error for prosecutorial misconduct, the appellant must: (1) make a timely and specific objection; (2) request an instruction to disregard the matter improperly placed before the jury; and (3) move for mistrial. *See* Tex. R. App. P. 33.1; *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993); *see also Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000) (stating that a timely objection gives the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection); *see also Huffman*, 746 S.W.2d at 218 (holding that a defendant must object that the prosecutor's question was "clearly calculated to inflame the minds of the jury and [was] of such a character so as to suggest the impermissibility of withdrawing the impression

produced"). Here, defense counsel did not object to the complained-of question. Counsel made no request for an instruction, nor did she move for a mistrial. Thus, in accordance with Texas Rule of Appellate Procedure 33.1, the error, if any, is not preserved for appeal.

Assuming, arguendo, that counsel had properly preserved error, a prosecutor is traditionally given great leeway in posing questions and making reasonable deductions from the evidence. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). In this case, although the prosecutor's question—"The next time you have to provide an alibi for your brother?"—may not have been a direct deduction from the evidence, there is nothing to suggest that the prosecutor's line of questioning was clearly calculated to inflame the minds of the jury or that it was of such a character so as to suggest the impermissibility of withdrawing the impression produced. A prompt instruction to disregard will generally cure an error associated with an improper question and answer. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Having reviewed the record, we do not believe the question was so inflammatory or of such a character that, had Carter requested an instruction to disregard, the instruction would not have cured any prejudicial effect.

Because Carter failed to preserve error, or alternatively, the prosecutor's question was not so egregious that it could not have been cured by an instruction from the trial court, we overrule the third issue.

The trial court's judgment is affirmed.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 20th day of November, 2008.

18